834

DIESEL TANKER S.D. MADDOCK, INC., recurrente, *v.* COMMON-
WEALTH OIL REFINING CO., INC. y su aseguradora COM-
MERCIAL INS. CO. OF NEWARK, NEW JERSEY; PROCON IN-
TERNATIONAL, S.A., recurridas.

*Número:* R-73-265 *Resuelto:* 6 de mayo de 1976

*Hartzell, Ydrach, Mellado Santiago, Pérez & Novas,* abogados de la recurrente; *Vivas, Martínez-Texidor & Limeres,* abogados de C.O.R.C.O. y Commercial Insurance Co. of Newark, New Jersey; *Bird, Bird & González,* abogados de Procon International, S.A.

EL JUEZ ASOCIADO SEÑOR DÍAZ CRUZ emitió la opinión del Tribunal.

Al cabo de cuatro viajes entre los puertos de Guayama y Tallaboa en los que transportó unos 28,000 barriles de nafta parafínica, sustancia inflamable, y ya lavados sus tanques con agua fresca, hubo necesidad de limpiar la escoria que en forma de costra o fango estaba adherida a las bodegas del tanquero propiedad de Diesel Tanker S.D. Maddock, Inc., para cuya labor el dueño del barco, a través de Commonwealth Oil Refining Co., Inc. (CORCO), obtuvo los servicios de Procon International, S.A., contratista de mantenimiento. CORCO suplió el equipo especializado para el trabajo. La brigada esperó por pruebas que hizo el primer oficial del barco con un detector de gases (explosímetro),[1] instrumento de precisión que manejó desde cubierta valiéndose de mangas de extensión que llegaban a los tanques. Hechas las pruebas dicho oficial determinó y declaró el sitio libre de gases y por lo tanto seguro para trabajar cerca de las 6:00 P.M. del 7 de septiembre de 1969, hora en que bajaron los obreros de limpieza

[1] El Reglamento del Servicio de Guardacostas dispone:

". . . . . . . .

(b) Barcazas y barcos tanques autorizados a transportar líquidos Grado A, B, C o D [nafta parafínica es Grado A] a cualquier temperatura, o líquidos Grado E, a altas temperaturas, estarán equipados con un detector de gas combustible adecuado para determinar la presencia de concentraciones explosivas en el material transportado . . . ."

El manual publicado el 2 de marzo de 1964 por el Servicio de Guardacostas, bajo el epígrafe "Detectores de Gas Combustible" advierte:

"La presencia de gases combustibles a bordo puede detectarse por un químico naval o un oficial del barco entrenado para operar un detector de gases [explosímetro].

"La muestra de gas se absorbe del compartimiento a través de una línea hasta el instrumento y pasa sobre un filamento de aluminio caliente. Si hay gases combustibles, arderán en el filamento aumentando su calor y resistencia eléctrica. Esta mutación eléctrica ocurrirá en proporción directa a la concentración de gas combustible y se reflejará en el reloj métrico del instrumento.

"Estos instrumentos son útiles si están bien calibrados y en buena condición, cuando los maneja una persona entrenada y diestra para interpretar sus lecturas. Dichas lecturas deberán tomarse en todos los puntos a través de los compartimientos afectados, especialmente en áreas o bolsillos susceptibles de acumulación localizada de gases." *A Manual for the Safe Handling of Inflammable and Combustible Liquids*, citado, a la pág. 55.

a los tanques. A la 1:30 A.M. del siguiente día, completada la labor en dos de los tanques y mientras se trasladaban al tercero, ocurrió una explosión seguida de fuego que causó graves quemaduras a dos trabajadores no obstante haber ellos subido rápidamente a cubierta donde cayeron inconscientes. En la bitácora (*logbook*) que el capitán de la nave ha de llevar por exigencia de Ley del Congreso (46 U.S.C.A. secs. 201, 202) dicho oficial hizo un asiento en que señala la combustión espontánea[2] como causa del accidente.

Los dos trabajadores lesionados demandaron en daños a Commonwealth Oil Refining Company (CORCO), a Diesel Tanker S.D. Maddock, Inc., y otras partes que es prolijo mencionar. Diesel Tanker, dueña del barco, a su vez reconvino e instó demandas contra tercero y coparte imputando negligencia a CORCO por haber suplido un equipo defectuoso e inadecuado; y contra Procon bajo el principio de garantía implícita que en Derecho Marítimo impone al contratista la prestación de servicios de manera propia, segura, razonable y competente. En el curso del juicio los obreros demandantes transigieron su reclamación contra Diesel por una suma global de $140,000 y como resultado de las pruebas practicadas durante seis días de vista, el Tribunal Superior dictó sentencia aprobando la transacción a cuyos fines declaró con lugar, sin costas ni honorarios, la demanda de los trabajadores contra el armador Diesel Tanker S.D. Maddock, Inc., y sin lugar toda la progenie de reconvenciones, demandas de tercero y coparte

---

[2] " 'Ollo Spontaneous Combustion in tank No. 4 starboard while gang working. Two workers; Rufino Collazo and Cruz Rodríguez burned taken to hospital. Work Stopped.'

(Bottom of page)

Injured Procon Workmen
Cruz Rodríguez Echevarría (Co. No. 416)
Address Bo. Tallaboa Saliente, Peñuelas,
P.R. 00724
Rufino Collazo Román (Co. No. 416)
Address Bo. Tuebardos, Peñuelas,
P.R. 00724."

en que se envolvieron las partes demandadas. Diesel Tanker, dueña del barco, recurrió en revisión insistiendo en su derecho a ser indemnizada por Procon y CORCO en la cantidad que el armador pagó a los obreros. Expedimos el auto.

De los siete señalamientos de error que hace la recurrente, cinco no son más que modalidades particularizadas de un ataque a la apreciación de la prueba, a saber [a], [b] y [e] que la sala de instancia no estimó la prueba suficiente para hacer al contratista Procon y a CORCO responsables por negligencia a la recurrente; [c] determinar a base de prueba pericial que el accidente se debió a combustión espontánea; [d] concluir que el primer oficial de la recurrente fue negligente al hacer la prueba de gases y declarar la bodega segura.

Como errores de derecho acusa [f] valor probatorio extendido por el juez sentenciador al asiento de bitácora y [g] alcance e interpretación de las Reglas y Reglamentos de la Guardia Costanera para Buques Tanques del 1ro. de mayo de 1969.

La recurrente hace gran esfuerzo para vincular la explosión y el fuego con la condición defectuosa de una lámpara y extensión eléctrica que alega apareció después del accidente rota y el cable con un alambre descubierto; y en el informe(³) de la enfermera Sepúlveda de Erickson, quien dio primera ayuda a los obreros lesionados, el cual sirvió de base para el informe de accidente al Fondo del Seguro del Estado. El juez de instancia rechazó esta teoría como indigna de

---

(³) Esta enfermera declaró que los obreros no perdieron el conocimiento y que le relataron la forma en que ocurrió el accidente y que conforme con dicho relato ella hizo el siguiente informe:

"Estaban dentro del barco limpiando el tanque #4 del Barco Raymond J. Bushey el cual se encontraba en el muelle #2, estaban usando una extensión eléctrica la cual tenía las conexiones que conectan a la bombilla flojas y al desprenderse la bombilla de la extensión la punta de ésta hizo contacto con la tola de los tanques causando que los gases que estaban en el tanque se prendieran."

crédito al confrontarla con el testimonio de uno de los obreros, (⁴) del médico que los atendió en emergencia y de otros testigos más que los vieron inconscientes caídos sobre cubierta, imposibilitados de hablar. La bombilla y su cable eléctrico no fueron presentados en evidencia por lo que es altamente especulativa su descripción como defectuosa considerando que hubo de sufrir la erosión del fuego. El extenso y bien razonado testimonio pericial dejó claro que la explosión no fue causada por contactos de alambre o fricción de implementos usados en la remoción de los residuos de nafta parafínica, sino por reacciones químicas de los gases que produjeron la llama de com-

---

(⁴) El obrero Cruz Rodríguez Echevarría declara:

"Cuando terminamos en la primer sección, que bajé a la sección número 2, para yo esperar que el compañero me pasara la extensión, al pasármela, yo no la llegué a coger, fuá, el fuego, una explosión." T.E. pág. 190.

. . . . . . . .

"Dígame Don Druz: ¿después del accidente perdió Ud. el conocimiento?

"Ya le digo que yo subí; no sé ni como subí; yo sé que yo no supe de más nada.

"¿Qué tiempo estuvo inconsciente?

"A mí me dejaron, como a los tres días en el hospital me vine a dar cuenta; llevaba tres días." T.E. pág. 194.

El médico Dr. Luis A. Barranco declara:

"¿Tuvo Ud. oportunidad u ocasión de atender allá para el día 6, . . . 7 de septiembre de 1969 a los señores Cruz Rodríguez Echevarría y Rufino Collazo?

"Sí, señor, los atendí.

"¿Dónde los atendió Ud?

"En la emergencia, Sala de Emergencia de la Clínica Doctor Pila, en ocasión de la . . . de su total estadía en dicha institución.

"¿Podría Ud. decirle al Hon. Tribunal la condición, en cuanto a si estaban conscientes o inconscientes, en que éstos estaban, cuando Ud. los atendió a ellos en la Sala de Emergencia de la Clínica Doctor Pila?

"TESTIGO:

"Ese día, ambos pacientes fueron traídos, después de haber sufrido un accidente. Estaban bajo la protección de la Ley de Compensación de Accidentes del Trabajo. En el examen rutinario, en el examen en la Sala de Emergencia de la Clínica Doctor Pila, los pacientes habían sufrido quemaduras extensas. Su condición en aquel momento era una condición crítica. Su estado de inconsciencia, mejor dicho, su estado de consciencia estaba completamente abolido, o sea, estaban en estado inconsciente." T.E. págs. 301–2.

bustión espontánea. No hay fundamento en el ataque de la recurrente que sitúa al juez descansando principalmente en la anotación sobre combustión espontánea hecha por el capitán del barco en el libro bitácora. Dicho asiento, que era prueba admisible, sirvió para corroborar el verdadero origen y causa del siniestro, ampliamente demostrado por otra evidencia oral y pericial.

■■■ Bajo la doctrina de condición apta para navegar (*seaworthiness*) la recurrente dueña del barco venía obligada a proveer a la brigada contratada para limpiar los tanques, un sitio seguro de trabajo. Esta obligación del armador (dueño de barco), se extiende en todo su rigor a personas que sin ser miembros de la tripulación, realizan labor por contrato a bordo, "porque de ordinario el contratista no tiene derecho ni oportunidad de descubrir y eliminar la causa del peligro y es por tanto dudoso que él deba a sus empleados, con relación a estos riesgos, la obligación usual de todo patrono de proveer un lugar seguro de trabajo, con la posible excepción de casos en que el peligro sea obvio o creado por su propio acto." El uso de contratistas independientes con brigadas especialmente adiestradas para el trabajo a bordo no disminuye el riesgo para el obrero ni debe anular la protección a que tiene derecho. *Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85 (1946).

■ La recurrente intentó cumplir su deber de garantizar la seguridad de estos trabajadores cuando su primer oficial, valiéndose del equipo medidor de gases (explosímetro) hizo unas pruebas antes de indicarle a los obreros que no había peligro en bajar a las bodegas y comenzar su labor. Si en vez de limitarse a esa primera lectura, el oficial que manejaba ese instrumento especializado, hubiese hecho un seguimiento con subsiguientes lecturas espaciadas a través de las horas de labor se habría revelado la posterior concentración de gases combustibles que habían convertido los tanques

del barco en sitio inseguro. En este caso el barco tenía el equipo apropiado, exigido por el Reglamento del Servicio de Guardacostas (Escolio 1), y el contratista tenía derecho a confiar en que el detector de gas combustible en poder del barco sería usado cuantas veces fuere necesario para proteger sus hombres de una explosión y fue esa una aparente condición del contrato según se desprende de la conducta de las partes: el primer oficial haciendo las pruebas y los hombres absteniéndose de subir a bordo hasta que aquél les informa que el lugar de trabajo está seguro.

 El dueño de barco que contrata personal para trabajar a bordo debe cuidarse de que el sitio de trabajo sea seguro. De lo contrario se considera el barco inepto (*unseaworthy*) sin importar cómo surgió esa condición. (5) La responsabilidad basada en ineptitud para navegar (*unseaworthiness*) es radicalmente distinta a la responsabilidad basada en negligencia.

---

(5) Esa era la doctrina vigente para septiembre de 1969 cuando ocurrió este accidente. Una enmienda introducida por el Congreso el 27 de octubre de 1972 a la Sec. 5 de la Ley conocida como Longshoremen's and Harbor Workers' Compensation Act alteró fundamentalmente la responsabilidad basada en "*seaworthiness*", ya superada su utilidad de proveer una protección óptima a los obreros, actualmente bien amparados por el incremento en los sistemas de compensación por accidentes del trabajo. La nueva legislación específicamente excluye la demanda contra tercero que antes tenía el dueño del barco, aquí ejercitada por la recurrente Diesel Tanker, con el siguiente lenguaje:

"Sec. 5(b) In the event of injury to a person, covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 33 of this Act, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void.

". . . . . . . .

"The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this Act." Public Law 92–576—Oct. 27, 1972—Norris, *The Law of Maritime Personal Injuries 3rd*, Sec. 298.

La razón, claramente, estriba en que la ineptitud para navegar es *una condición*, y la causa determinante de esa condición, fuere negligencia o cualquiera otra, es del todo irrelevante a la responsabilidad del armador por daños personales derivados de la misma. Este concepto de ineptitud para hacerse a la mar se extiende para incluir toda situación de peligro o inseguridad, [6] divorciada de los principios de negligencia, que disminuyen la utilidad del barco en el servicio a que se le destina. *Usner* v. *Luckenbach Overseas Corp.*, 400 U.S. 494 (1971). La obligación del dueño del barco de mantenerlo en condición para navegar (*seaworthy*) no depende de la negligencia de aquél o sus agentes; ni aún de su conocimiento real o implícito de la condición de inseguridad. *Mahnich* v. *Southern S.S. Co.*, 321 U.S. 96. El carácter de esta obligación es absoluta, esencialmente un tipo de responsabilidad absoluta (objetiva) que concebida para confrontar los peligros inherentes a la navegación, no puede aprisionarse por normas de negligencia o de contratos. Es por su naturaleza una obligación sin reserva debida a todos aquellos a quienes alcanza su política humanitaria. *Seas Shipping Co.* v. *Sieracki*, supra, 94–95. Ratificados en *Mitchell* v. *Trawler Racer, Inc.*, 362 U.S. 539 (1960).

■ En *Ryan Stevedoring Co.* v. *Pan Atlantic S.S. Corp.*, 350 U.S. 124 (1955), se declaró el derecho de indemnización del armador (dueño del barco) contra el contratista independiente patrono del obrero si viola la garantía implícita o expresa de rendir sus servicios en una manera propia, razonable, segura y en forma competente (*workmanlike manner*). El contratista Procon no violó este principio de garantía implícita de labor. La prueba demostró que utilizó los equipos ade-

---

(6) La protección al trabajador brindada por la doctrina de aptitud para la navegación (*seaworthiness*), reconocida a los estibadores en *Seas Shipping Co.* v. *Sieracki*, 328 U.S. 85, 90 (1948), se hizo extensiva a personal a cargo de limpieza de tanques. *Guerrini* v. *United States*, 67 F.2d 352 (1948); *Crawford* v. *Pope & Talbot, Inc.*, 206 F.2d 784 (1953).

cuados al trabajo y que no descuidó la seguridad de sus hombres. La condición peligrosa presente en la concentración de gases combustibles no era un riesgo obvio y patente para el contratista de trabajo. Era una realidad revelable por una sola de las partes en el contrato, la recurrente Diesel única que tenía a su disposición el instrumento medidor de gases y el personal técnico diestro en su manejo. [7] Como antes expresamos, la prueba figura el contrato como dejando en manos de la recurrente esa medida de precaución, que debió ejercer a plenitud [8] con lecturas a intervalos. No se afectó, por tanto, la obligación del contratista de hacer el trabajo con cuidado y prudencia, careciendo la recurrente de acción para recobrar de Procon parte alguna de la indemnización pagada a los obreros. *Seas Shipping Co.* v. *Sieracki,* supra; *Crawford* v. *Pope & Talbot,* ante. Tampoco puede Diesel Tanker recobrar contra Commonwealth Oil Refining Co. porque los hechos correctamente estimados por el juez sentenciador excluyen toda posibilidad de que el equipo de trabajo por ella suplido fuera defectuoso o causante del accidente laboral.

■ Las conclusiones del Tribunal Superior tienen firme base en la prueba por lo que no hemos de intervenir con las mismas (Regla 43 de Procedimiento Civil), y la aplicación del Derecho es correcta. *Revisados la sentencia, el extenso récord taquigráfico y el expediente en general, no encontramos que la Sala de Ponce del Tribunal Superior, haya incurrido en error alguno. Confirmada.*

---

[7] La responsabilidad debe recaer sobre aquella parte en mejor situación para adoptar medidas preventivas y así reducir las probabilidades de daño. *Italia Societa* v. *Oregon Stevedoring Co.,* 376 U.S. 315, 324 (1964).

[8] La prueba de gases es confiable solo en el momento en que se hace. La buena práctica exige pruebas adicionales con el detector cuando se remueve el sedimento en los tanques o compartimientos, se muda el lastre, se desconecta la tubería, se cierra el tanque o cuando surge cualquier otra condición que afecte el contenido de gases. Coast Guard—*Fire Fighting Manual for Tank Vessels* (Julio 1, 1968), pág. 40.