SOCIEDAD DE GANANCIALES c/p LUZ M. HERNÁNDEZ y EDGARDO LÓPEZ FLORES, demandante y recurrente, *v.* GONZÁLEZ PADÍN CO., INC., ETC., demandado y recurrido.

Número: R-84-525 Resuelto: 21 de marzo de 1986

96

*Enrique Reyes Coreano,* abogado de los recurrentes; *Alex González* del Bufete Alex González, abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ emitió la opinión del Tribunal.

La Sra. Luz M. Hernández de López, cliente de las tiendas por departamento conocidas por el nombre comercial de González Padín, visitó el día 13 de octubre de 1978 la sucursal ubicada en el Viejo San Juan. El propósito de la visita era cambiar, por un tamaño mayor, un pantalón de su hijo que había comprado anteriormente. La referida dama se encaminó al departamento de ropa de niños donde abordó directamente a una empleada del mismo, enseñándole su comprobante de compra y explicándole a ésta el propósito de su visita. Dicha empleada procedió a realizar el cambio deseado.

No habiendo recibido instrucción ulterior alguna por parte de la empleada, la señora Hernández de López se dirigió al primer piso con el propósito de abandonar el referido establecimiento comercial. Al así hacerlo, se activó una alarma debido a que no se le había removido a la mercancía una "etiqueta plástica de inventario" que forma parte de un sistema electrónico conocido como *sensormatic*, el cual había sido implantado *en fecha reciente* en las tiendas González Padín con el propósito de evitar el hurto de mercancía.

Al activarse la alarma, empleados del establecimiento comercial "intervinieron" con la señora Hernández de López. La prueba respecto a este punto fue conflictiva: la referida dama adujo que fue *obligada* por personal de la tienda a permanecer en la misma durante aproximadamente treinta (30) minutos, siendo tratada en forma descortés y abusiva hasta tanto se pudo aclarar la situación. La prueba de la demandada, por el contrario, fue a los efectos de que la permanencia de la dama en su establecimiento fue voluntaria y a "manera de invitación". Así lo concluyó el tribunal de instancia en sus determinaciones de hecho. Ello no obstante, el referido foro determinó que el "incidente alteró el ánimo de las personas que estaban en la tienda en esos momentos así como el ánimo de la co-demandante y el de los empleados que con ella intervinieron, pero esa alteración no pasó de lo que es normal y natural en casos como el que nos ocupa". (1)

El Tribunal Superior de Puerto Rico, Sala de San Juan, expresando, en síntesis, que la prueba antes reseñada no de-

---

(1) Debe señalarse que la parte demandante —compuesta por la señora Hernández de López, el esposo de ésta, y la sociedad legal de gananciales compuesta por ambos— presentó, en adición, prueba demostrativa de que la señora Hernández de López tuvo que ser sometida a tratamiento psiquiátrico por espacio de quince (15) meses debido a una "reacción de ansiedad severa con depresión" que se le desarrollara como consecuencia del incidente acaecido. El tribunal de instancia, aparentemente debido al resultado al que llegó en la sentencia que emitiera, no hizo determinaciones de hecho sobre este aspecto de la prueba.

mostraba la comisión de acto negligente alguno por parte de los empleados de la firma comercial demandada, declaró sin lugar la demanda de daños y perjuicios radicada. Incónforme, la parte demandante acudió en revisión ante este Tribunal imputándole al foro de instancia la alegada comisión de tres (3) errores, a saber:

*Primer Error:* El Honorable Tribunal de Instancia erró al concluir que los empleados de la demandada y recurrida no incurrieron en negligencia al detener y restringir la libertad de la dama demandante y recurrente como sospechosa de haberse apropiado ilegalmente de mercancía de la demandada y recurrida.

*Segundo Error:* El Honorable Tribunal de Instancia erró al concluir que la empleada de la demandada y recurrida, Carmen Acevedo no incurrió en negligencia, al cambiar y entregar a la demandante y recurrente un pantalón sin llevarlo a la cajera para extraerle la etiqueta de inventario conforme al procedimiento de "Sensormatic".

*Tercer Error:* El Honorable Tribunal de Instancia erró al no hacer determinación sobre la prueba médica del Dr. Miguel A. García Jiménez, Psiquiatra, el cual declaró que la condición de "Reacción de Ansiedad con Depresión" que padece la dama demandante y recurrente, es consecuencia de la actuación de detención y privación de la libertad de la demandada y recurrida. (Énfasis suprimido.)

Le concedimos término a la parte demandada recurrida para que mostrara causa por la cual este Tribunal no debía expedir el auto solicitado y dictar sentencia revocatoria de la emitida por el foro de instancia. Dicha parte ha comparecido. Resolvemos.

# I

El caso de autos nos brinda la oportunidad de examinar, a la luz de nuestro ordenamiento jurídico de origen civilista, el alcance de la facultad del propietario de un establecimiento comercial para proteger su propiedad mediante la utilización

de artefactos electrónicos o mecánicos modernos y la responsabilidad civil de éste por los "daños" que puedan sufrir sus clientes como consecuencia del uso de dichos artefactos.

El Art. 280 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 1111, define el derecho de propiedad de la siguiente manera:

La propiedad es el derecho por virtud del cual una cosa pertenece en particular a una persona con *exclusión* de cualquier otra.

La propiedad concede el derecho de *gozar y disponer* de las cosas sin más limitaciones que las establecidas en las leyes.

El propietario tiene acción contra el tenedor y el poseedor de la cosa para *reivindicarla*. (Énfasis suplido.)

█ Como vemos, dicho artículo de ley concede al propietario de una "cosa", en términos generales, tres grandes facultades, a saber: *gozar, disponer* y *accionar para reivindicar* la cosa. En relación con estas "facultades" o, lo que es lo mismo, con el "contenido" del derecho de propiedad, Puig Brutau subraya que en "realidad se trata de un breve esquema legal que encierra *un contenido mucho más amplio*". (Énfasis suplido.) (²) A esos mismos efectos, Albaladejo nos informa que "[H]acer una enumeración exhaustiva de facultades es imposible, *porque siempre quedará algún aspecto del señorío sobre la cosa, en el que quepa pensar singularmente, y concebirlo como otra nueva facultad*".(³) (Énfasis suplido.)

█ Debemos mantener presente, en adición, que este "contenido" del derecho de propiedad puede ser dividido o

---

(²) J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1971, T. III, Vol. I, pág. 167.

(³) M. Albaladejo, *Curso de Derecho Civil Español*, Barcelona, Ed. Bosch, 1982, T. III, págs. 159–160.

clasificado en dos aspectos: positivo y negativo. Sobre esto, Puig Brutau señala que:

> En *sentido positivo* [el propietario] puede obtener del objeto de su derecho el aprovechamiento natural, usándolo y obteniendo los frutos o rendimientos correspondientes; igualmente corresponde al aspecto positivo la facultad de realizar actos jurídicos mediante los que disponga de su derecho, enajenándolo o sometiéndolo a gravámenes o limitaciones. En *sentido negativo,* el propietario tiene el *derecho de excluir* a los demás para que no interfieran o impidan el uso, disfrute y disposición del objeto de su derecho. (Énfasis suplido.) (⁴)

■ En cuanto a fincas, esta llamada facultad o derecho de exclusión que posee el propietario está plasmada en las disposiciones del Art. 322 de nuestro Código Civil, 31 L.P.R.A. sec. 1231, el cual, en lo pertinente, dispone que todo "propietario podrá cerrar o cercar sus heredades por medio de paredes, zanjas, setos vivos o muertos, *o de cualquiera otro modo".* (Énfasis suplido.)

Castán, a esos efectos y en lo pertinente, expresa que:

> *Facultades de Exclusión.*—Son estas facultades complemento y garantía de las de aprovechamiento, *en cuanto permiten al propietario impedir la intromisión o perturbación.*
> . . . Figuran en este grupo de facultades:
> 1°. El derecho del propietario *de colocar la cosa en condiciones de que nadie pueda perturbarle en el goce de la misma,* o lo que es igual, el derecho de cerrar o cercar sus fincas, reconocido . . . por el artículo 388 del Código civil [Artículo 322 de nuestro Código Civil] . . . . (Énfasis suplido.) (⁵)

J. Roca Juan, en su colaboración a la obra *Comentarios al Código civil y compilaciones forales,* reitera lo expresado por Castán al señalar que el precepto contenido en el Art. 388 del Código Civil español es reflejo del *contenido excluyente* de

---

(⁴) Puig Brutau, *op. cit.,* págs. 167–168.

(⁵) J. Castán, *Derecho civil español, común y foral,* Madrid, Ed. Reus, 1982, T. II, Vol. 1, pág. 170.

la propiedad. (⁶) Manresa, por su parte, nos informa que mediante el citado Art. 388 del Código Civil español se consigna "un derecho, llamado con acierto *de exclusión y de defensa*". (Énfasis suplido.) (⁷)

Este "derecho de exclusión o de defensa" que posee el propietario es aplicable, naturalmente, tanto a fincas rústicas como urbanas. Como correctamente nos señala Lacruz, la "autorización de cerramiento viene pensada por la Ley para las fincas rústicas, *porque en cuanto a las urbanas nunca cupo duda de su posibilidad*". (Énfasis suplido.) (⁸) A esos mismos efectos, véase M. Albaladejo, *Curso de Derecho Civil Español*, Barcelona, Ed. Bosch, 1982, T. III, pág. 228.

Sobre la *manera* en que puede verificarse el "cierre o cercado", Scaevola aclara que:

> Al valerse nuestro artículo de las expresiones *cerrar* y *cercar*, debió sin duda tener en cuenta los diversos sentidos en que los tratadistas y aun las mismas disposiciones legales las consideran. *Cerrar*, según el Diccionario de la Lengua, *significa poner algún impedimento que estorbe la entrada o salida de una cosa;* mientras que *cercar* supone rodear o circunvalar algún sitio con vallado, tapia o muro. . . .

> . . . Por esto ha declarado la jurisprudencia administrativa que los terrenos de propiedad particular se consideren cerrados o acotados y prohibida la invasión en ellos, no siendo preciso que estén cercados de pared continua, *bastando cualquier señal material y visible que indique el hecho de la propiedad y la voluntad del dueño de disfrutarla exclusivamente.* . . . (Énfasis suplido.) (⁹)

---

(⁶) M. Albaladejo, *Comentarios al Código civil y compilaciones forales*, España, Ed. Rev. Der. Privado, 1980, T. V, Vol. I, pág. 369.

(⁷) J. M. Manresa, *Código Civil Español*, 8va ed. rev., Madrid, Ed. Reus, 1976, T. III, pág. 431.

(⁸) J. L. Lacruz, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1979, T. III, Vol. I, pág. 221.

(⁹) Q. M. Scaevola, *Código Civil*, 4ta ed., Madrid, Ed. Reus, 1943, T. VII, págs. 183–184.

Albaladejo nos informa, por su parte, que el "cierre puede ser material, como con una tapia u otros obstáculos. *Pero puede ser también simbólico, como cuando se anuncia por letreros u otros medios de prohibición de paso"* (énfasis suplido) ([10]); añade que generalmente *"para practicar el cierre parece que debe bastar con la determinación que tome y ponga en práctica el dueño".* ([11]) (Énfasis suplido.)

■ Debe mantenerse presente, sin embargo, que el derecho de propiedad, ([12]) al igual que todos los otros derechos en un sistema jurídico ordenado, está sujeto por su propia naturaleza a una serie de limitaciones y restricciones necesarias para la realización de objetivos y valores sociales colectivos, así como también que el ordenamiento, en determinadas circunstancias, expresamente impone sobre el propietario ciertos deberes y responsabilidades. Como expresa Puig Brutau:

> El derecho de propiedad no puede entenderse como un medio para la actuación ilimitada del individuo. *Responde a un fin racional y por ello tiene límites intrínsecos,* incluso con independencia de los que resultan de la existencia de derechos expresamente concedidos a otros titulares frente al propietario.
>
> Hay, pues, *limitaciones fundadas en la propia naturaleza de la propiedad,* que los Tribunales reconocerán incluso sin disposición positiva concreta, por el solo hecho de la existencia del derecho y para que bajo la apariencia de éste no se atente contra el ordenamiento jurídico. Existen también *disposiciones estrictamente legales,* tanto para la protección de los derechos privados como en interés público o general, y tanto consistentes en una limitación del uso o de la facul-

---

([10]) *Curso de Derecho Civil, op. cit.,* pág. 228.

([11]) Íd., pág. 228.

([12]) Y, por consiguiente, el derecho del dueño al uso y disfrute de la cosa y sus facultades de exclusión y la defensa de la misma.

tad de excluir, como en someter al propietario a una trans-
misión forzosa. (Énfasis suplido.) ([13])

■ No puede perderse de vista, por último, que las "limi-
taciones" al derecho de propiedad no sólo tienen un "aspecto
negativo" —desde el punto de vista de que no puede hacerse
con referencia al bien— sino que tienen un "aspecto positivo",
en el sentido de imponer al propietario la obligación de pre-
venir los daños que en el ejercicio de su derecho de propiedad
pueda ocasionar a terceros. Como certeramente señala Scae-
vola:

> . . . Porque, al fin, y en resumen, lo que representa la ma-
> teria objeto de este capítulo es el cumplimiento de una *inex-*
> *cusable obligación* que acompaña al derecho de propiedad,
> por virtud del cual todo el que sea dueño de una cosa *se ve*
> *compelido*, necesariamente, velando por los intereses de los
> demás, *a prevenir los peligros o amenazas que aquélla ofrez-*
> *ca*. Y el particular amenazado en su hacienda o en su per-
> sona puede obligarle, caso de que aquél no lo fuere volunta-
> riamente, a que ponga por obra *todos los medios de precau-*
> *ción que las circunstancias señalen en cada caso concreto.*
> (Énfasis suplido.) ([14])

■ Al amparo de los principios antes enunciados no debe
haber duda de que, *previa la observancia de ciertas precau-*
*ciones o salvaguardas*, en nuestra jurisdicción el propietario
de un bien —*en el "goce y disfrute", y "en defensa", de su*
*derecho de propiedad*— tiene la "facultad" o el derecho de
hacer uso de mecanismos, instrumentos o estructuras, *que no*
*sean ni inherentemente peligrosos ni atenten contra la inte-*
*gridad personal de los seres humanos,* ([15]) con el legítimo pro-

---

([13]) Puig Brutau, *op. cit.,* págs. 261–262. Véase, en adición, Castán,
*op. cit.,* pág. 217.

([14]) Scaevola, *op. cit.,* pág. 193.

([15]) Un artefacto, instrumento o estructura que sea peligroso per se
obviamente estaría incluido dentro de las "limitaciones intrínsecas" del
Derecho de propiedad. Véase Anotación, *Fence as Nuisance,* 80 A.L.R.3d
962.

pósito de "cerrar" su propiedad y así evitar que personas inescrupulosas le hurten impunemente su propiedad.

## II

■ Tratándose en el presente caso de una situación donde el "objeto" del derecho de propiedad es un establecimiento comercial abierto al público, nuestra jurisprudencia ha impuesto al propietario del mismo un deber particular que lo obliga de manera especial con las personas que son inducidas por él a patrocinar el mismo. Como expresáramos en *Gutiérrez* v. *Bahr*, 78 D.P.R. 473, 474 (1955):

> Es un principio universal de derecho que cuando una persona o empresa mantiene abierto un establecimiento al público, con el objeto de realizar en dicho establecimiento operaciones comerciales para su propio beneficio, debe mantener dicho establecimiento en condiciones de seguridad tales, que la persona inducida a penetrar en el mismo, *no sufra ningún daño*. (Énfasis suplido.) [16]

El quebrantamiento o incumplimiento de este deber por parte del propietario, o sus empleados, y la responsabilidad civil que podría originarse a partir de ese hecho nos lleva, naturalmente, al ámbito de las obligaciones extracontractuales y, en particular, a la discusión y consideración de la responsabilidad del propietario, en una jurisdicción como la nuestra de origen civilista, por los daños que por acción u omisión de él, o sus empleados, puedan sufrir terceras personas dentro de su propiedad. [17]

---

[16] Véanse, en adición: *Goose* v. *Hilton Hotels*, 79 D.P.R. 523 (1956); *Santaella Negrón* v. *Licari*, 83 D.P.R. 887 (1961); *Weber* v. *Mejías*, 85 D.P.R. 76 (1962); *Aponte Betancourt* v. *Meléndez*, 87 D.P.R. 652 (1963); *Feliciano* v. *Escuela de Enfermeras*, 94 D.P.R. 535 (1967); *Rivera* v. *Supermercados Amigo, Inc.*, 106 D.P.R. 657 (1977).

[17] En este aspecto, las decisiones emitidas por tribunales de jurisdicciones del *common law* no son de mucha ayuda. A diferencia de las jurisdicciones civilistas —donde, *como discutiremos más adelante,* existe una norma genérica de responsabilidad, la cual sólo requiere prueba de acto u omisión

■ Comentando el Art. 1902 del Código Civil español —Art. 1802 del Código Civil de Puerto Rico— expresa Lacruz que el mismo "establece, *con valor de principio*, que el que por acción u omisión causa daño a otro interviniendo culpa o negligencia, está obligado a reparar el daño causado". (Énfasis suplido.) [18] Añade que dicha disposición legal se enuncia *"en forma de regla general y sin concretarse a determinados tipos de infracción"* (énfasis suplido), [19] lo que presupone una *norma genérica* que nos prohíbe causar daño a otro mediante conducta ya sea activa, ya pasiva.

Santos Briz, [20] por su parte, añade que el citado Art. 1902 del Código Civil español:

. . . exige como elementos o requisitos para que proceda la reparación del daño causado: 1) La acción u omisión infractora del contrato o productora del acto ilícito extracontractual. 2) La antijuricidad de la misma. 3) La culpa del agente. 4) La producción de un daño. 5) La relación de causa a efecto entre la acción u omisión y el daño.

■ Respecto a cuando una omisión se considera como "antijurídica", el referido autor sostiene que "pueden ser . . . antijurídicas cuando afecta al omitente *una especial obligación de evitar el daño*". (Énfasis suplido.) [21] Añade, por último, al discutir la posibilidad de una omisión o acto negativo como "causa del daño", que:

La doctrina moderna e incluso nuestra jurisprudencia consideran la causalidad en la omisión. El acto omisivo puede

---

culposa o negligente, daños, y relación causal entre ambos— las jurisdicciones del *common law* se limitan a reconocer una serie de "delitos civiles concretos" con "requisitos específicos". Véase H. Brau Del Toro, *Los daños y perjuicios extracontractuales en Puerto Rico*, San Juan, Pubs. J.T.S., 1980, Cap. 1, págs. 1–5.

[18] Lacruz, *op. cit.*, 1977, T. II, Vol. I, pág. 188.

[19] Id., pág. 188.

[20] En su colaboración a la obra: *Comentarios al Código civil y compilaciones forales, op. cit.*, 1984, T. XXIV, pág. 101.

[21] *Op. cit.*, pág. 105.

106

merecer, desde el punto de vista jurídico, el concepto de "causa" del daño. Para ello se requiere: *a*) Que con verosimilitud rayana en seguridad se hubiera evitado el daño de haberse realizado la acción omitida; *b*) Que para evitar el resultado [dañoso] hubiese [el] deber jurídico de obrar.(²²)

 Nuestra jurisprudencia, en armonía con lo esbozado por la doctrina civilista anteriormente citada, ha señalado que "[S]egún el citado artículo [Art. 1802 de nuestro Código Civil], *que establece uno de los principios más fundamentales de nuestro orden jurídico* —el de la responsabilidad aquiliana por hechos propios— todo perjuicio, material o moral, da lugar a reparación si concurren tres requisitos o elementos: *primero*, se establece la realidad del daño sufrido; *segundo*, existe un nexo causal entre el daño y la acción u omisión de otra persona; y *tercero*, dicho acto u omisión es culposo o negligente". (Énfasis suplido.) *Hernández* v. *Fournier*, 80 D.P.R. 93, 96 (1957). Véanse, en adición: *Pérez Escolar* v. *Collado*, 90 D.P.R. 806 (1964); *Jiménez* v. *Pelegrina Espinet*, 112 D.P.R. 700, 703 (1982). En cuanto a la responsabilidad en particular resultante de omisiones, de un análisis de las decisiones emitidas por este Tribunal a través de los años se desprende que los factores a considerarse son: primero, la existencia o inexistencia de un "deber jurídico de actuar" por parte del alegado causante del daño, el incumplimiento del cual deber constituye precisamente la "antijuricidad" de que hablábamos anteriormente, *Quiñones* v. *Duarte Mendoza*, 112 D.P.R. 223 (1982); *Reyes* v. *Phoenix Assurance Co.*, 100 D.P.R. 871 (1972); *Flores Flores* v. *Pizarro Cordero*, 90 D.P.R. 384 (1964); *Oliver* v. *Municipio de Bayamón*, 89 D.P.R. 442 (1963), y segundo, si de haberse realizado el acto omitido se hubiere evitado el daño. *López Surita* v. *A.F.F.*, 93 D.P.R. 601 (1966); *Cruz Costales* v. *E.L.A.*, 89

(²²) Ibíd, pág. 271.

D.P.R. 105 (1963), y *Morales Muñoz* v. *Castro*, 85 D.P.R. 288 (1962) (²³).

## III

La instalación y utilización por la demandada recurrida González Padín —o por cualquier otra empresa comercial— del sistema conocido como *sensormatic*, o cualquier otro similar, ciertamente no choca contra ninguno de los principios pertinentes y aplicables de nuestro ordenamiento jurídico. Se trata de un mecanismo electrónico que es utilizado con el fin o propósito legítimo de evitar el hurto indiscriminado de la mercancía existente en dichos establecimientos, el cual ni es inherentemente peligroso ni es uno que atente contra la integridad personal de los clientes de los mismos. Resolvemos en su consecuencia que, previa la observancia de ciertos requisitos o salvaguardas, (²⁴) el dueño de un estableci-

---

(²³) A pesar de que la mayoría de los casos arriba citados, *en cuanto al "requisito de causalidad"*, fueron resueltos al amparo de la "teoría de causa próxima" u otras teorías de origen angloamericano, y que en *Soc. de Gananciales* v. *Jeronimo Corp.*, 103 D.P.R. 127 (1974), y *Jiménez* v. *Pelegrina Espinet*, 112 D.P.R. 700 (1982), este Tribunal "adoptó" para Puerto Rico la teoría civilista de "causalidad adecuada", debe advertirse que los criterios para considerarse una omisión como fuente de responsabilidad no variaron en modo significativo.

(²⁴) La utilización de dichos sistemas conlleva ciertas y determinadas obligaciones y responsabilidades. El dueño de un establecimiento comercial que resuelva utilizarlos debe:

1— Notificar, en forma apropiada y razonable, a los clientes que patrocinan el establecimiento de que dicho mecanismo está siendo utilizado en el mismo. Debe recordarse que "La persona que tiene el dominio o derecho del dominio del lugar u operación en que existen las anteriores circunstancias *está en el deber de advertir* del peligro existente *así como de las precauciones que se deben tomar a aquellas que, por invitación suya, se encuentran en dicho lugar*. Dicha persona debe ejercer el mayor cuidado y tomar todas las precauciones que conoce o debió conocer para evitar tal peligro". (Énfasis suplido.) *Vda. de Delgado* v. *Boston Ins. Co.*, 99 D.P.R. 714, 723-724 (1971). Véase, en adición, *Restatement (Second) of Torts* Sec. 84 (1965);

2— Establecer y mantener un programa de inspección y mantenimiento adecuado en relación con el mismo. *Cf. Rivera* v. *Rivera Rodríguez*, 98

miento comercial en Puerto Rico puede lícitamente hacer uso de un sistema de esa naturaleza en "defensa" de su derecho de propiedad. No obstante, debe mantenerse presente que la responsabilidad de que dicho sistema funcione *adecuada y apropiadamente* corresponde, de manera primaria y como regla general, al establecimiento comercial. Ello, por razón de que "La responsabilidad debe recaer sobre aquella parte en mejor situación para adoptar medidas preventivas y así reducir las probabilidades de daño". *Diesel Tanker* v. *CORCO*, 104 D.P.R. 834, 843 n. 7 (1976).

■ En el presente caso, como hemos visto, la demandante acudió en solicitud de ayuda a una empleada del establecimiento comercial con el propósito de realizar el cambio deseado. Ésta no desprendió de la mercancía en controversia la "etiqueta plástica de inventario" que hace funcionar la alarma del sistema *sensormatic;* tampoco advirtió a la demandante de la existencia de dicho artefacto y para que se dirigiera a la dependencia apropiada del establecimiento con el fin de que se le desprendiera la misma. ¿Tenía la referida empleada, en representación del dueño del establecimiento, el "deber jurídico" de así hacerlo? Entendemos que la contestación tiene que ser en la afirmativa. El establecimiento comercial como tal es quien está en "control" de la situación: es

D.P.R. 940, 943 (1970) a los efectos de que "El dueño y operador de un vehículo de motor tiene el deber de ejercer cuidado ordinario para que el vehículo esté en condiciones de razonable seguridad mecánica y adecuadamente equipado. . . . Entre esos deberes está el de ejercer cuidado razonable en la inspección del vehículo para descubrir defectos o averías que impidan su operación normal, dentro de un marco de razonable seguridad. De ahí que se le impute el conocimiento de defectos latentes o defectos que una inspección razonable hubiese descubierto", e

3— Instruir y entrenar adecuadamente en el uso del sistema a *todos* sus empleados; esto es, tanto a los que intervienen directamente con los clientes con motivo de las compras que éstos realizan, como los empleados encargados de la seguridad del establecimiento. Véase *Ayala* v. *San Juan Racing Corp.*, 112 D.P.R. 804 (1982).

"quien" nunca debe "olvidar" que tiene en operación un sistema de alarma contra hurto, es "quien conoce" con exactitud cómo funciona el mismo y cómo se evita su activación y es "quien sabe" a qué mercancía está adherida la "etiqueta de inventario" y a cual no. ([25]) En adición, es quien "debe mantener dicho establecimiento en condiciones de seguridad tales, que la persona inducida a penetrar en el mismo, no sufra ningún daño". *Gutiérrez* v. *Bahr*, ante, pág. 474.

La omisión de la empleada —obviamente negligente— es la que sin lugar a dudas causa la detención injustificada de la demandante por parte de los empleados de seguridad del establecimiento. En otras palabras, la omisión fue la causante del "daño sufrido", ([26]) omisión por la cual responde su patrono. Véanse: Art. 1803 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5142; *Lloréns* v. *Lozada*, 73 D.P.R. 271 (1952). Concurriendo los tres requisitos que exige nuestra jurisprudencia en esta clase de situaciones, *Hernández* v. *Fournier*, ante, la demandante tiene derecho a reparación del perjuicio sufrido por ella como consecuencia de la negligencia de la parte demandada.

Por los fundamentos expuestos, *se expide el auto, se dictará sentencia revocatoria de la dictada por el Tribunal Superior de Puerto Rico, Sala de San Juan, y se devuelve el caso a*

---

([25]) El uso del concepto de "control" para determinar responsabilidad bajo el Art. 1802 del Código Civil no es nuevo en nuestra jurisdicción. Véanse: *Rivera* v. *San Juan Racing Assoc., Inc.*, 90 D.P.R. 414 (1964); *Pérez Rivera* v. *Olazagasti Fiol*, 90 D.P.R. 779 (1964); *Santaella Negrón* v. *Licari*, supra, y *Mariani* v. *Christy*, 73 D.P.R. 782 (1952).

([26]) En *Casanova* v. *González Padín Co.*, 47 D.P.R. 488, 498 (1934) resolvimos, en síntesis, que la *duración* del encarcelamiento se refiere meramente al *alcance* de los daños y perjuicios y que "una detención momentánea, de ser ilegal, da derecho a una causa de acción absoluta". En *Ayala* v. *San Juan Racing Corp.*, supra, pág. 813, citando a Castán, hicimos claro que una lesión a la *libertad* es un daño en sí mismo y que una "persona, sea o no funcionario del orden público, puede por sí, o por mediación de otro, detener ilegalmente o causar que se detenga ilegalmente a otra persona. En ambos casos dicha persona respondería en daños y perjuicios, si dicha actuación es culposa o negligente".

*dicho foro para la continuación de los procedimientos compatibles con lo aquí resuelto.*

El Juez Presidente Señor Pons Núñez no interviene y el Juez Asociado Señor Negrón García concurre en el resultado sin opinión escrita.