# 97 DTA 183

## TRIBUNAL DE CIRCUITO DE APELACIONES
## CIRCUITO REGIONAL DE SAN JUAN

FREDDIE SANCHEZ GUARDIOLA Y OTROS
Demandantes-Apelantes

v.

HECTOR R. CRUZ Y OTROS
Demandados-Apelados

Núm. KLAN-96-00442

San Juan, Puerto Rico, a 25 de agosto de 1997

Panel integrado por su Presidente, Juez Negrón Soto
y los Jueces González Román y Urgell Cuebas

## TEXTO COMPLETO DE LA SENTENCIA

El Lcdo. Freddie Sánchez Guardiola, su esposa, y la sociedad de gananciales compuesta por ellos, por sí y en representación de sus cuatro hijos menores, apelan la sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan, que desestimó la demanda en daños y perjuicios extracontractuales presentada por ellos contra la Farmacia Siempreabierta (La Farmacia), sus dueños y la compañía aseguradora de éstos. En dicha demanda reclaman resarcimiento de daños resultantes de un asalto y robo de vehículo sufrido por el Lcdo. Sánchez Guardiola cuando regresaba al mismo, luego de hacer unas compras en la Farmacia.

Alegan los apelantes que incidió el tribunal *a quo* al concluir que los apelados no habían incurrido en omisión negligente y, por lo tanto, no eran responsables por los daños sufridos.

Procedemos a confirmar la sentencia apelada.

### I

En la sentencia apelada el Tribunal de Primera Instancia formuló las siguientes determinaciones de hechos:

*"1- El 12 de diciembre de 1991, alrededor de las 8:45 P.M., el demandante Freddie Sánchez Guardiola acudió a la Farmacia Siempreabierta, ubicada en la Ave. Domenech, Esquina Eddie Gracia en Hato Rey, Puerto Rico.*

*2- La Farmacia Siempreabierta, tiene un área de estacionamiento justamente frente a la farmacia. Esa noche estaban llenos los establecimientos y el demandante, optó por entrar en contra del tránsito con su vehículo Nissan Pathfinder en la calle lateral Eddie Gracia y estacionarse justamente al lado del zafacón tipo "container" de la compañía BFI que utilizaba la farmacia para disponer de sus desperdicios o basura. Este lugar donde se estacionó el demandante, no constituye área de estacionamiento de la farmacia y para poder lograr acceso al mismo, hay que subirse a la acera la cual no está provista para acceso de automóviles.*

*3- El área de estacionamiento provisto por la farmacia a sus clientes queda al frente de la misma y está debidamente iluminada. El demandante tuvo la oportunidad de estacionarse más cerca al área de entrada de la farmacia, en la misma calle lateral, pero optó por estacionarse en la parte antes mencionada.*

*4- El demandante entró a la Farmacia Siempreabierta y compró unos cigarrillos y algo más que no recuerda. En ese proceso llegó la testigo Laura Torres quien se estacionó en la calle Eddie Gracia, hacia el lado del Colegio La Merced, y pudo notar en ese momento un vehículo que se estacionó también en la calle Eddie Gracia y que llegó con unos jóvenes que le parecieron sospechosos. Dicha testigo procedió a entrar a la farmacia y pudo percatarse que el demandante se encontraba en dicha farmacia. Cuando el demandante regresó a su vehículo para abordarlo fue objeto de un asalto a mano armada o "carjacking" por dos individuos. Aproximadamente un minuto después que la testigo Torres entrara a la farmacia, regresó el demandante indicando que había sido*

*objeto de su asalto.*

*5- Para la fecha en que ocurre este incidente, la Farmacia Siempreabierta tenía un guardia de seguridad de nombre Jesús Mateo, quien también era Guardia Estatal de la Policía de Puerto Rico y que tenía una experiencia de aproximadamente quince años en la uniformada. Este policía estaba ubicado, en el momento del asalto, en su vehículo frente por frente a la Farmacia, al otro lado de la avenida frente al negocio conocido como "Recurt" mirando en dirección a la farmacia. El policía se pudo percatar cuando el demandante Freddie Sánchez llegó a la farmacia, cuando salió y cuando se dirigió hasta su automóvil.*

*El guardia de seguridad Sr. Mateo vio el vehículo salir inmediatamente, y vio cuando el demandante regresó nuevamente a la farmacia, por lo que procedió inmediatamente a entrar también. En ningún momento vio a los asaltantes, ya que el demandante se estacionó en el susodicho lugar en una posición en que el zafacón tipo "container" tapaba su carro. Es importante señalar que había espacio disponible antes del zafacón donde había completa visibilidad para el guardia de seguridad.*

*6- El área donde estaba ubicado el policía tenía vista que cubría todo el frente de la farmacia, así como el lateral que da hacia la calle Eddie Gracia y su visibilidad cubría por lo menos hasta donde estaba ubicado el zafacón BFI. Lo que impidió que el guardia de seguridad viera lo ocurrido fue el propio demandante que optó por estacionar su vehículo justamente detrás del zafacón, impidiendo de este modo la visibilidad del guardia de seguridad.*

*7- El policía Jesús Mateo que servía como guardia de seguridad tenía instrucciones de vigilar por la farmacia y sus áreas, lo cual hacía. Este también se ubicaba con alguna frecuencia en el área de "Recurt" antes mencionada, ya que entendía por su experiencia que era el mejor punto para llevar a cabo una seguridad adecuada de la farmacia tanto para los clientes y empleados de la farmacia como para su persona.*

*8- La farmacia tenía en el área de estacionamiento y áreas adyacentes una iluminación adecuada. A pesar de que en el momento del incidente había un poste de alumbrado, de los provistos por el Estado, fundido en la calle Eddie Gracia, había una lámpara fluorescente en la parte exterior de la farmacia que daba hacia la calle Eddie Gracia. Dicha lámpara brindaba iluminación suficiente para dicha área y permitía la visibilidad del guardia de seguridad, por lo menos hasta donde estaba ubicado el zafacón mencionado.*

*9- Durante el tiempo en que Jesús Mateo trabajó como guardia de seguridad de dicha farmacia, aproximadamente de cuatro a cinco años, solamente ocurrieron dos asaltos. En uno de ellos el guardia de seguridad que estaba en turno mató a un asaltante. No se pudo establecer si dicho asalto ocurrió antes o después del incidente que motiva la presente demanda.*

*10- El testigo Nelson López trabajó como cajero para la farmacia desde el mes de octubre de 1991. En el tiempo que trabajó dicho cajero, que fue aproximadamente de cuatro a seis meses, nunca fue asaltado en la farmacia y tenía el turno de la noche. Tampoco tiene conocimiento personal de que alguna otra persona fuera asaltada en dicha farmacia.*

*11- Al momento en que ocurre el asalto al demandante, la Farmacia Siempreabierta tenía las siguientes medidas de seguridad: guardia de seguridad, puerta con timbre electrónico, iluminación adecuada en el área de estacionamiento y cámaras de video en el interior de la farmacia.*

*12- Como consecuencia de este asalto, el demandante Freddie Sánchez Guardiola, sufrió un desorden de stress, post traumático controlado y el brote de un desorden bipolar al cual ya estaba genéticamente predispuesto."*

Fundamentándose en dichas determinaciones, luego de considerar el derecho aplicable sobre las normas de responsabilidad extracontractual, el tribunal concluyó que la Farmacia había cumplido con éstas, por lo que no existía violación de un deber jurídico que generase responsabilidad por los daños y perjuicios sufridos por los apelantes, procedió a desestimar la demanda.

No conforme, los apelantes recurren ante este Foro, señalando que incidió el tribunal apelado al:

*"(1) estimar que el asalto... se trataba de un incidente desafortunado cuya causa próxima fue la prevaleciente falta de seguridad pública ante la creciente ola criminal y la insuficiencia del Estado para proveer los medios para controlar la violencia y el crimen.*

*(2) concluir "que la parte demandada no creó ni agravó la situación sobre la cual actuó un tercero para producir el daño alegado".*

*(3) concluir que la parte apelada no incurrió en una omisión negligente [a pesar de] no mantener su negocio en condiciones de seguridad apropiadas y... [no] proveer iluminación en el costado lateral de la farmacia y mantener el cajón de basura en el medio de la acera.*

*(4) no determinar que la mala colocación del cajón de basura en un área carente de iluminación actuaron como causa interventora que propiciaron el asalto...*

*(5) no concluir que la violación de [una ordenanza municipal que prohibe la obstrucción de las aceras] fue la causa directa de los actos delictivos....*

*(6) no determinar que para un hombre prudente y razonable era previsible la ocurrencia del incidente que sufrió la parte demandante dada la peligrosidad del área circundante a la farmacia... y que no existían medidas de seguridad adecuadas."*

Aducen, además, los apelantes que incidió el tribunal apelado al excluir el testimonio de ellos y denegar la solicitud de determinaciones de hechos adicionales presentada por éstos.

Dada la naturaleza de los señalamientos de las partes, nos sometieron una exposición estipulada de la prueba oral y ordenamos se elevaran los autos originales, incluyendo todos los exhibits admitidos en evidencia.

## II

Los apelantes no señalaron ningún error en cuanto a las determinaciones de hechos formuladas por el tribunal apelado. ▮ Sin embargo, los apelados en su alegato aducen una discrepancia entre las determinaciones de hechos y la exposición estipulada de la prueba en cuanto al segundo párrafo de la determinación de hecho Núm. 5 y la determinación Núm. 6. Luego de examinar la exposición estipulada de la prueba concurrimos con el señalamiento que, según el testimonio presentado, el vehículo Pathfinder del Lcdo. Sánchez Guardiola fue estacionado frente al *"container"* de BFI, y no detrás del mismo como indican las determinaciones de hechos mencionadas. Al así hacerlo el vehículo obstruía la visión del zafacón que tenía el policía Mateo, ya que éste proveía vigilancia situado al otro lado de la Ave. Domenech, frente a la Farmacia. Esta pequeña discrepancia no alteraría las conclusiones del tribunal apelado, ni altera nuestra apreciación del caso.

Luego de examinar la exposición estipulada de la prueba y la prueba, así como prueba demostrativa y documental admitida en evidencia, concluimos que, con la excepción antes mencionada, la descripción de los hechos en la sentencia refleja la evidencia que tuvo ante su consideración el Tribunal de Primera Instancia.

La controversia en apelación se limita a las conclusiones de derecho que el tribunal apelado derivó de los hechos probados.

Bajo el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, la omisión negligente de un deber jurídico genera responsabilidad para resarcir daños si dicha omisión es la causa adecuada de los daños. En *Miranda v. E.L.A.*, 137 D.P.R. ___ (1994), **94 J.T.S. 152**, págs. 523-524, el Tribunal Supremo expuso al respecto como sigue:

*"El estándar de conducta para determinar si un acto es o no negligente es la diligencia exigible a la figura mítica de hombre prudente y razonable". Hernández v. La Capital, 81 D.P.R. 1031, 1038 (1960). "[L]a culpa o negligencia es la falta de debido cuidado que a la vez consiste, esencialmente*

*en no anticipar y prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancia. Ramos v. Carlo, [85 D. P.R. 353, 358 (1962)]". Ocasio Juarbe v. Eastern Air Lines, Inc.,* [125 D.P.R. 410 (1990)]

Por otro lado, *"[e]n nuestra jurisdicción rige la doctrina de causalidad adecuada. Jiménez v. Pelegrina Espinet, 112 D.P.R. 700 (1982); Sociedad de Gananciales v. Jerónimo Corp., 103 D.P.R. 127 (1974). Conforme esta teoría no es causa toda condición sin la cual no se hubiese producido el resultado, sino aquella que ordinariamente lo produce según la experiencia general. Arroyo López v. E.L.A., [126 D.P.R. 682 (1990)]; Cárdenas Marzán v. Rodríguez Rodríguez, [125 D.P.R. 702 (1990)]";* Brau del Toro Herminio, *Los Daños y Perjuicios Extracontractuales en Puerto Rico,* **Publicaciones J.T.S.,** Vol. 1, pág. 696 *et seq.* Al amparo de esta doctrina la cuestión se reduce a determinar si la ocurrencia del daño era de esperarse en el curso normal de los acontecimientos o si, por el contrario, queda fuera de ese posible cálculo. Santos Briz, Jaime, *Comentarios al Código Civil y Compilaciones Forales,* Madrid, Ed. Revista Derecho Privado, 1984, Tomo XXIV, a la pág. 267 Según explicáramos en *Arroyo López v. E.L.A., supra*:

*"... para que exista relación causal la acción u omisión tiene· que·ser idónea para producir el efecto operado, tiene que determinarlo normalmente. A fin de establecer esa vinculación de causa y efecto entre esos dos sucesos, tenemos que realizar un análisis retrospectivo de posibilidad. En vista de ello, no es suficiente que un hecho aparezca como condición de un evento, si regularmente no trae aparejado ese resultado. La causalidad está necesariamente limitada por el ámbito de la obligación, pues es infinita la serie de daños que, en interminable encadenamiento pueden derivarse del incumplimiento de una obligación. Estremera v. Inmobiliaria Rac, Inc., 109 D.P.R. 852, 857 (1980).*

*El propósito de utilizar criterios como el de causa adecuada o causa próxima es limitar la cadena de responsabilidad y evitar que se extienda a límites absurdos. Brau, op. cit. 709-710. Si se ha incurrido o no en responsabilidad civil resultante de una omisión hay que considerar dos factores:* **la existencia o inexistencia de un deber jurídico de actuar por el alegado causante del daño cuyo incumplimiento constituye un acto antijurídico y, si de haberse realizado el acto omitido, se hubiera evitado el daño."** *Sociedad de Gananciales v. González Padín Inc., 117 D.P.R. 94 (1986)." Rivera Jiménez v. Garrido & Co., supra. (Enfasis suplido.)*

En el caso de autos es necesario que consideremos el efecto de la existencia de una mano criminal en el caso de autos. En *Estremera v. Inmobiliaria Rac, Inc., supra*, el Tribunal Supremo al considerar este aspecto, se expresó como sigue:

*"El incremento de la violencia, el reto del criminal a la paz y sosiego del pueblo y la creciente probabilidad de que una persona sea víctima de un atentado contra su vida, su libertad o su propiedad, es una enfermedad del medio ambiente en que las personas nacen, se educan, trabajan o simplemente existen. Es condición o circunstancia de la atmósfera general en que se desarrolla la gestión vital de cada miembro de la sociedad; y es primordialmente, problema de seguridad pública y responsabilidad del Estado, la única entidad con los recursos y la fuerza necesarios para mantener la paz y majestad de la Ley. Si tal es el ámbito en que se vive y se contrata, y tal la indefensión del pueblo contra ese tercero violento,* **los contratantes no pueden ser responsables de la irrupción del crimen en el campo de sus negocios, a menos que éstos sean de los que, por su naturaleza esencial, vengan obligados a ofrecer un grado de protección y seguridad independiente del que puedan proveer las agencias de seguridad pública.** *Así el hotel, que básicamente duplica el hogar, el hospital y la escuela, sin agotar la lista, vienen obligados a mantener unas medidas razonables de seguridad en protección de sus huéspedes, pacientes y estudiantes, que no tienen que suplir otros contratantes y empresarios, cuya actividad no absorbe necesariamente en el ámbito de la ejecución del contrato, la protección de partes y terceros contra ataques criminales. El Código Civil tiene provista la norma de responsabilidad relativa, conjugada con la clase de actividad en su Art. 1057 (31 L.P.R.A. sec. 3021) que ordena: "[L]a culpa o negligencia del deudor consiste en la omisión de aquella diligencia que exija la naturaleza de la obligación y corresponda a las circunstancias de las personas, del tiempo y del lugar...."* (Enfasis suplido.)

Además, en *J.A.D.M. v. Centro Com. Plaza Carolina,* 132 D.P.R. ___ (1993), **93 J.T.S. 26,** pág. 10438, al examinar una demanda en daños contra un centro comercial regional, el Tribunal Supremo

consideró como persuasiva la norma incluida en la Sec. 344 de Restatement (Second) of Torts, Vol. 2, págs. 223-226, la cual indica:

*"[§ 344. Business Premises Open to Public: Acts of Third Persons or Animals]*

*A possessor of land who holds it open to the public for entry for his business purposes is subject to liability to members of the public while they are upon the land for such a purpose, for physical harm caused by the accidental, negligent, or intentionally harmful acts of third persons or animals, and by the failure of the possessor to exercise reasonable care to (a) discover that such acts are being done or are likely to be done, or (b) give warning adequate to enable the visitor to avoid the harm, or otherwise to protect them against it.*

............

*[Comment: f. Duty to police premisses.] Since the possessor is not an insurer of the visitor's safety, he is ordinarily under no duty to exercise any care until he knows or has reason to know that the acts of the third person are occurring, or are about to occur. He may, however, know or have reason to know, from past experience, that there is likelihood of conduct on the part of third persons in general which is likely to endanger the safety of the visitor even though he has no reason to expect it on the part of any particular individual. If the place or character of his business, or his past experience, is such that he should reasonably anticipate careless or criminal conduct on the part of third persons, either generally or at some particular time, he may be under a duty to take precautions against it, and to provide a reasonably sufficient number of servants to afford a reasonable protection."*

Lo citado no se debe interpretar como que establezca un deber de proveer protección por policía privada en cualquier situación en la que se puede prever la posibilidad de actividad criminal. Al respecto, Plaza Carolina, *supra*, pág. 10438, indica:

*"... Si la previsibilidad per se creara un deber de ofrecer protección policíaca para otros, cada tienda o almacen tendría que ser vigilado por el dueño. La cuestión no es simplemente si un acto delictivo es previsible, pero si existe un deber de tomar medidas de protección. En última instancia, si existe o no este deber es una cuestión de equidad y justicia que requiere un balance de la relación entre las partes, la naturaleza del riesgo y el interes público en la solución propuesta..... La ocurrencia de actos delictivos previos no produce una responsabilidad automática por delitos subsiguientes; más bien, el deber de prevenir actos delictivos obliga a tomar medidas razonables de precaución para evitar que ocurran delitos similares. Si aun con la fuerza policíaca de Estado la ola criminal nos arropa, no podemos ser irrazonables y pretender que las manos privadas asuman la protección de los ciudadanos. Hay que establecer un balance sin llegar a lo absurdo."* (Enfasis suplido.)

Luego de considerar la anterior y otra jurisprudencia de carácter persuasivo, procedente del derecho angloamericano, en Plaza Carolina, *supra*, pág. 10439, el Tribunal Supremo formuló la siguiente norma: ■

*"De las doctrinas aplicables a situaciones similares a las del caso de autos, tanto en Puerto Rico, como en la mayor parte de los estados, se puede colegir que para poder responsabilizar a un centro comercial regional por actos delictivos de un tercero cometidos contra un cliente en sus predios, debe haber un quebrantamiento del deber de proveer adecuada y razonable vigilancia. Este deber se basa en la naturaleza de la actividad llevada a cabo en un centro comercial regional y en la previsibilidad de actos delictivos previos en el centro comercial o de circunstancias que hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos. El quebrantamiento de este deber dependerá de si las medidas tomadas fueron o no adecuadas. La adecuacidad de las medidas adoptadas a su vez dependerá, entre otras cosas, de: (1) la naturaleza del centro comercial y las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se esté registrando en el área del centro; y de (3) si las medidas de seguridad que se adopten son razonables y van dirigidas a minimizar la posibilidad de que los patrocinadores del centro sufran daños causados por la actividad criminal intencional de terceros.*

*Ahora bien, el hecho de que ocurra un acto delictivo por parte de un tercero que cause daños, no significa que automáticamente el centro comercial sea responsable. Tampoco el hecho de que ocurra un daño de esa naturaleza quiere decir que las medidas de seguridad son inadecuadas. La responsabilidad no es automática ni absoluta; dependerá de los hechos y la totalidad de las circunstancias de cada caso en particular."*

En resumen, la existencia de evidencia de actividad criminal requiere del comerciante que tome medidas razonables de precaución para reducir la posibilidad de ocurrencia de actos similares en el futuro. El hecho de que ocurra un acto de esa naturaleza, no quiere decir que las medidas sean inadecuadas. Al evaluar las medidas tomadas no se puede llegar a lo absurdo, sino que hay que establecer un balance entre el riesgo previsible y el peso de tomar las medidas, a la luz de la relación entre las partes y el interés público en la solución propuesta.

De los hechos probados en el caso de autos, se desprende que ocurrió otro asalto, aunque no se pudo determinar si dicho asalto ocurrió antes o después del incidente de autos. La Farmacia había instituido las siguientes medidas de seguridad para protección de su personal y sus clientes: (1) servicio de guardia de seguridad provisto por un miembro de la Policía de Puerto Rico, (2) iluminación adecuada en el área de estacionamiento, (3) puerta de entrada al establecimiento con timbre electrónico, (4) cámaras de video en el interior de la farmacia. (Véase las determinaciones de hechos, en particular la Núm. 11.) Estas medidas de seguridad habían sido adoptadas para proteger una farmacia que proveía cuatro lugares de estacionamiento al borde de una avenida de sustancial tránsito vehicular.

La Farmacia no es un asegurador de la seguridad de sus clientes. El mero hecho de que haya ocurrido un acto criminal que causó daños no la responsabiliza. Al evaluar las medidas de seguridad adoptadas por la Farmacia, concluimos que no existe omisión negligente de parte de ésta, por lo que no incidió el tribunal apelado al desestimar la demanda.

Los apelantes formulan dos señalamientos de errores adicionales que son claramente inmeritorios. Señalan que no se le permitió presentar al testigo Sr. Roberto Rivera, quien no había sido incluido como testigo en el Informe sobre Conferencia entre Abogados. Los apelantes no sometieron enmienda a dicho informe, a pesar de que en la minuta de 28 de enero de 1994 el tribunal apelado les había indicado que *"[c]ualquier enmienda que se haga al informe radicado deberán someterla mediante un informe suplementario".* Además, señalan que el tribunal apelado no acogió varias determinaciones de hechos propuestas por los apelantes. Pero en su Escrito de Apelación y en su Alegato Suplementario ni siquiera nos indican cómo se sostienen las determinaciones de hechos propuestas, con referencia a la exposición estipulada de la prueba u otra prueba admitida. En vista de ello, no consideraremos este señalamiento de error, dada la falta de una discusión apropiada de los mismos. *Quiñones López v. Manzano Pozas,* 141 D.P.R. ___(1996), **96 J.T.S. 95,** pág. 1309; *PFZ Prop., Inc. v. Gen. Acc. Ins. Co.,* 136 D.P.R. ___ (1994), **94 J.T.S. 116.**

### III

Por las consideraciones antes discutidas, se confirma la sentencia apelada. El Juez Negrón Soto emitió voto disidente.

Así lo pronunció y manda el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 97 DTA 183

**1.** Los apelantes incurren en la censurable práctica de repetir en innumerables ocasiones en su escrito que ocurrieron diez asaltos en la Farmacia, a pesar de que no nos señalan en su alegato el fundamento en la evidencia presentada para tal aseveración. El 9 de mayo de 1994 el tribunal apelado, a solicitud de los apelantes, emitió una orden al Superintendente de la Policía para que se le proveyesen a éstos:

*"... todas las querellas y/o informes de asaltos, asaltos con mano armada, robos, 'car jacking' u otros delitos*

*graves perpetuados entre enero de 1990 al presente, en la Farmacia Siempreabierta, o sus alrededores, cubriendo desde la salida del Expreso Las Américas hacia la avenida Domenech, hasta la intersección de La Viña y el Banco Santander de Puerto Rico."*

Luego de considerar toda la evidencia, el tribunal apelado consideró probado que habían ocurrido dos asaltos durante un período de cinco años (Det. Hechos. Núm. 9).

**2.** El Tribunal Supremo, en la nota al calce Núm. 6 de Estremera, *supra*, expone la norma en forma alterna como sigue:

*"Se dan, no obstante, otras situaciones en las que recae sobre el demandado una responsabilidad especial por la protección del demandante, o en las que una tentación u oportunidad especial de conducta criminal propiciadas por el demandado, le imponen la obligación de tomar precauciones contra ellas. La responsabilidad por protección puede surgir de un contrato mediante el cual el demandado se ha obligado a proveerla; o puede fundarse en alguna relación entre las partes, como porteador y pasajero, hotelero y huésped, invitante y visitante en negocios, escuela y discípulo, patrono y empleado, arrendador y arrendatario, y sin duda, otros más. En todas estas situaciones, sin embargo, **habrá responsabilidad sólo si el demandado es negligente en no tomar precauciones contra el posible criminal; esto es, si el riesgo previsible es de dimensión irrazonable comparado con el peso de tomarlas.** Así una prisión no viene obligada a extremar su vigilancia de un falsificador, sin récord de violencia, para protección del demandante; una ventana sin asegurar la cerradura no da lugar a riesgo indebido de escalamiento; y a un porteador no se le exigirá especial precaución en una zona aparentemente segura."* Prosser, [*The Law of Torts*, 4ta ed. (1971), págs. 174-176].

**3.** Al considerar situaciones de hechos como la de autos, donde el volumen de actividad es significativamente menor que en un centro comercial regional, es necesario considerar que la norma general requiere balancear el *"riesgo previsible"* contra el "peso de tomar" las medidas protectoras. *"Hay que establecer un balance sin llegar a lo absurdo." Plaza Carolina, supra.*

---

**VOTO DISIDENTE DEL JUEZ DE
APELACIONES SR. NEGRON SOTO — 97 DTA 183**

San Juan, Puerto Rico, a 25 de agosto de 1997

No estamos de acuerdo con la conclusión a que llega la mayoría de este Tribunal de que en la acción de daños y perjuicios entablada por los demandantes-apelantes no mediara negligencia de los demandados-apelados. Aunque los hechos generales expuestos por el Tribunal de Primera Instancia, Sala Superior de San Juan, y adoptados en la sentencia emitida por este Foro son correctas, con excepción de las determinaciones de algunos hechos contenidos en el segundo párrafo de la número 5 y la número 6, se omiten los hechos medulares que claramente sostienen la negligencia de los demandados-apelados. Examinemos esos hechos.

**I**

El Sr. Freddie Sánchez Guardiola, en adelante Sánchez, quien es abogado, conocía el área y el lugar en donde ubicaba la Farmacia Siempreabierta, en lo sucesivo Farmacia, y era cliente de la misma. La noche de los hechos Sánchez llegó a la Farmacia y por estar ocupados los únicos cuatro (4) o cinco (5) estacionamientos marcados que dan hacia la Avenida Domenech, se estacionó en la calle lateral, Eddie Gracia, al lado de un zafacón de basura, propiedad de los dueños de la Farmacia. La propiedad donde ubica la Farmacia hace esquina con esas dos vías públicas. El lugar de los hechos no estaba alumbrado ya que el foco de la calle Eddie Gracía, más próximo a la Farmacia, estaba fundido. Tampoco estaba funcionando el único foco, que era uno fosforescente, que había instalado en la parte posterior del lado adyacente a dicha calle de la Farmacia, mirándola desde la Avenida Domenech. De hecho, dicho foco, de haber estado funcionando, no podía dar luz al área de estacionamiento que utilizó Sánchez ya que el zafacón, que era uno grande, ■ impedía que la luz alumbrara esa área, o sea que operaba como una pared o muralla.

El área en que ocurrió el asalto y donde estaba estacionada la guagua Nissan Pathfinder de Sánchez era parte del solar de la Farmacia. En dicha área cabían más de cuatro (4) vehículos de motor estacionados. Como los estacionamientos marcados en la Avenida Domenech eran claramente insuficientes para los empleados y el público que asistía a ese negocio, esa otra área era usada por los clientes y empleados de la Farmacia para estacionarse. Existía en esa parte lateral de la Farmacia, colindante con la Calle Eddie Gracia, un sardinel que fácilmente era brincado por los vehículos de motor, especialmente, por los similares al de Sánchez. Más adelante, o sea, detrás del zafacón, había un área en el solar de la Farmacia que estaba preparada para la entrada de vehículos de motor. En dicha parte, que daba acceso a la parte trasera de la Farmacia, había una entrada sin portón --con más profundidad que el espacio de estacionamiento-- donde podían estacionarse hasta dos (2) vehículos de motor, sitio que era usado generalmente por sus dueños y empleados. Según surge de las fotografías, admitidas en evidencia, tampoco esta parte tenía alumbrado. Fue en esa área en donde los dueños de la Farmacia inicialmente colocaron el zafacón grande de basura.

Sin embargo, como le era difícil al vehículo pesado (truck) entrar a esa área para recoger el zafacón y vaciarlo, además, de que un doctor que tenía su consultorio en la casa adyacente se quejó de que los olores que expedía el mismo le molestaban, los dueños de la Farmacia lo movieron al área lateral, que daba hacia la Calle Eddie Gracia, a pesar de estar conscientes que con ello se obstaculizaba la vista de la parte posterior de esa área; que el sitio adolecía de alumbrado y que ello propiciaba que se escondiera detrás del zafacón cualquier asaltante. ■

Específicamente, el dueño de la farmacia, Sr. Héctor R. Cruz, declaró que *"allí se puede esconder cualquier persona detrás del zafacón"*, pág. 8 de su deposición; que era *"...predecible que una persona se esconda para cometer un asalto"*, *ibid*, pág. 10; que hubo dos asaltos allí que fueron informados a la Policía; que luego del accidente en ese terreno hicieron una remodelación y extendieron la Farmacia hasta la acera; que luego del asalto Sánchez eliminó el zafacón grande y comenzaron a utilizar zafacones pequeños mediante un acuerdo con el gobierno municipal; y que una guagua Isuzu Trooper que aparece en una fotografía en el mismo lugar del asalto de Sánchez se le parecía a la del licenciado Fontán, que es empleado de la Farmacia.

El hecho de que era previsible el que una persona se pudiera esconder detrás del zafacón y facilitara un asalto, más aún cuando el sitio carecía de alumbrado, y el zafacón obstaculizaba la luz que podía dar la lámpara fosforescente --la cual se había fundido para la fecha de los hechos-- fue corroborado por el guardia de seguridad que estaba esa noche de servicio en la Farmacia. También, esa previsibilidad la sostuvo la esposa del dueño, Sra. Ramonita Figueroa Hernández, quien ejercía las funciones de Administradora de la Farmacia. A esos efectos, ella indicó en su deposición que era *"previsible que una persona se esconda allí y efectúe un asalto"*, *ibid*, pág. 60. Además, declaró que luego que ocurrieron unos asaltos, siendo el primero poco tiempo después que comenzó a funcionar la Farmacia, emplearon a un guardia de seguridad; que a éste no le dieron instrucciones, aunque preferían y querían que él estuviera dentro de la Farmacia; que sabía que él se situaba en muchas ocasiones fuera de la Farmacia,; que en el lugar de los hechos se acostumbraban estacionar personas que visitaban la Farmacia, lo que era para su beneficio; que posteriormente al asalto quitaron el zafacón y el Municipio de San Juan recogía la basura en zafacones pequeños; que en uno de los asaltos ocurrió una muerte; que estaba consciente que en total allí ocurrieron alrededor de ocho asaltos o situaciones, *ibid*, pág. 58; que, además de emplear un guardia de seguridad, instalaron una puerta con timbre electrónico, iluminaron el área de estacionamiento que da hacia la Avenida Domenech y colocaron cámaras de video dentro de la Farmacia; y que no tomaron ninguna otra precaución.

Lo relativo a que no había alumbrado en el área entre el zafacón y la parte del estacionamiento de la Avenida Domenech, también fue corroborado por la testigo Aurea M. Torres Ramos, quien fue la clienta de la Farmacia que al llegar a ese lugar observó cuando dos jóvenes sospechosos llegaron en un vehículo y se desmontaron y caminaron en dirección hacia la parte de atrás del zafacón, que fue de donde salieron los que asaltaron a Sánchez minutos después cuando él salió de la Farmacia y fue a montarse en su vehículo. (Págs. 11 a la 21 de su deposición).

Ante este cuadro fáctico surge claramente que la Farmacia tenía conocimiento de la incidencia criminal que ocurría en esa área en horas de la noche; de que el lugar era uno solitario por estar al otro lado de la calle una escuela que está cerrada fuera de las horas diurnas de clases; que allí acudía un

alto número de clientes, lo que hacía insuficientes los cuatro (4) o cinco (5) estacionamientos del frente de la Ave. Domenech y requería utilizar para estacionar --tanto de día como de noche-- el área lateral a su propiedad sin estar cercada o tener plantas ni otros aditamentos que lo impidiera, y sin tener aviso alguno que advirtiera o prohibiera su uso como estacionamiento; que localizar el zafacón en una posición que resultaba en una pared o muralla entre el foco del alumbrado y la entrada de la Farmacia por la Avenida Domenech, hacía inoperante el mismo, lo que creó una situación de oscuridad total en el área y por consiguiente peligrosa; y que era previsible que detrás de ese zafacón se escondieran asaltantes. No obstante, en forma inexplicable, los demandados alegaron que adoptaron unas medidas de seguridad aplicables a esa situación fáctica. Examinemos las mismas.

1. Emplearon un guardia de seguridad con instrucciones de estar adentro y no afuera de la Farmacia, quien cuando salía de la Farmacia se situaba en la puerta de entrada o en la otra esquina de la Avenida Domenech y Calle Eddie Gracia. Desde ninguno de esos dos lugares éste podía observar y vigilar esa parte del estacionamiento, donde se estacionó Sánchez ya que estaba oscura y, menos aún, el área de atrás del zafacón y la entrada hacia la parte trasera de la Farmacia, por lo que su presencia era inoperante.

2. Instalación de un timbre electrónico en la puerta de entrada a la Farmacia, cuando de lo que se trata en este caso es del estacionamiento que no se ve desde el interior ni desde esa entrada. Así, ello es irrelevante a este caso.

3. Iluminaron adecuadamente el estacionamiento de la Avenida Domenech, cuando la prueba sostuvo que la misma sólo cubría la parte del frente de la Farmacia y no donde se estacionó el demandante y se estacionaban sus empleados y clientes. Pero, más aún, la prueba acreditó que la única iluminación en el sector de la Calle Eddie Gracia consistía del foco fundido que había en esa vía pública, el que tampoco daba iluminación a ese lugar, y la luz fosforescente que estaba en la parte trasera de la Farmacia que no alumbraba más allá del zafacón ya que éste servía como pared o muralla a dichos dos focos.

4. Localizar cámaras de video en el interior de la Farmacia, lo que no tenía ninguna relación con el estacionamiento donde ocurrió el incidente.

Así, luego de la ocurrencia de los primeros actos delictivos en la Farmacia, inconcebiblemente sus dueños, los aquí demandados, agravaron conscientemente la situación peligrosa poniendo el zafacón como muralla o pared para que facilitara la actividad criminal en perjuicio claro de ellos mismos, sus empleados y clientes sin tomar precaución alguna.

En resumen, estamos ante una situación donde el dueño de la Farmacia mantuvo ese estacionamiento, a sabiendas de la actividad criminal que ocurría en ese lugar, sin iluminación y con un zafacón que permitía que allí se escondieran personas para seguir llevando a cabo actos delictivos, sin tomar ninguna medida de seguridad, lo que ocasionó que ocurriera un nuevo asalto, el del demandante.

## II

El estado de derecho a que alude correctamente la sentencia de la mayoría es claro, en el sentido de que tiene que haber una causa adecuada o causa próxima entre el acto negligente y el daño causado. En este caso esa causalidad fue más que adecuada. Existía un deber jurídico de los demandados, (i) primero, de mantener el área de estacionamiento alumbrada y si la alumbraban no podían agravar la situación poniendo una pared que no permitiera pasar la luz, como ocurrió desde que cambió el zafacón a ese lugar; (ii) segundo, si no querían que los visitantes, clientes y empleados se estacionaran en ese sitio peligroso, entonces estaban obligados a poner una verja, plantas u otros aditamentos que lo impidiera; (iii) tercero, para que fueran efectivas las cámaras de video en ese lugar tenían que instalar alguna de ellas en ese estacionamiento y con ilumunación suficiente; y (iv) cuarto, al guardia de seguridad tenían que facilitarle el acceso a ese lugar y darle instrucciones para que visitara el mismo frecuentemente. No hicieron eso ni nada. Se cruzaron de brazos, lo que no podían hacer. *Soto Rivera v. Ayala Amely*, **92 J.T.S. 178**; *Collado v. E.L.A.*, 98 D.P.R. 111 (1969); *Cruz Costales v. E.L.A.*, 89 D.P.R. 105 (1963). Como se dice en Soto Rivera, *supra*, pág. 10269, en la Opinión de Conformidad y Concurrente del Juez Asociado Señor Negrón García:

*"Como fuente de responsabilidad civil, el Art. 1802 del Código Civil (31 L.P.R.A. sec. 5141) impone el deber de actuar con prudencia en nuestro diario vivir. El concepto de previsibilidad es la base que sostiene el principio de responsabilidad extracontracual. Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 1819 (1987), y casos allí citados; Pacheco v. A.F.F., 112 D.P.R. 296, 300 (1982). A su vez, la norma de previsibilidad se encuentra regulada por la razonabilidad, procurándose así limitar las bases de la responsabilidad a aquellas consecuencias normales y realmente previsibles de la transgresión de una norma jurídica". Rivera Pérez v. Cruz Corchado, supra.*

Se cita en apoyo de la decisión tomada el caso de *Estremera v. Inmobiliaria Rac, Inc.,* 109 D.P.R. 852 (1980), cuando en ese pleito la situación fáctica era distinta al de marras ya que sólo se imputaba la falta de iluminación de un tramo de la escalera. ■ No obstante, desde antes del 1980 y más amplia y consistentemente después de ese año, nuestro Tribunal Supremo ha estado resolviendo que en nuestra jurisdicción el propietario de un bien inmueble utilizado como negocio tiene que adoptar el uso de todos aquellos mecanismos o instrumentos que sean necesarios para evitar que se cometan actos que atenten contra la seguridad de los seres humanos que los patrocinan.

Específicamente, en *Rivera v. Supermercado Amigo Inc.,* 106 D.P.R. 657, 659-660 (1977), al resolverse una acción de daños y perjuicios por haber sufrido un parroquiano de ese supermercado una caída al resbalar en una cáscara de mangó que estaba en el pavimento de su estacionamiento, se dijo que:

*"Existe una línea de casos que sostiene que cuando una persona o empresa mantiene abierto un establecimiento al público, con el objeto de llevar a cabo operaciones comerciales para su propio beneficio, debe mantener dicho establecimiento en condiciones de seguridad, que la persona inducida a penetrar en él no sufra ningún daño".* Así en *Gutiérrez v. Bahr,* 78 D.P.R. 473 (1955), referente a lesiones producidas por un abanico eléctrico instalado en el plafón hicimos responsable de los daños al dueño del establecimiento. En *Goose v. Hilton Hotels,* 79 D.P.R. 523 (1956), imputamos responsabilidad al demandado por lesiones producidas por una escalera mojada instalada en un hotel. En *Santaella Negrón v. Licari,* 83 D.P.R. 887 (1961), resolvimos que había falta de cuidado debido al público al tener el dueño de un edificio una puerta que abría hacia un corredor lesionando a una persona que caminaba por el pasillo en el momento que alguien abrió la puerta hacia dicho pasillo. También en *Weber v. Mejías,* 85 D.P.R. 76 (1962), encontramos que acarreaba responsabilidad el tener una escalera lisa instalada en una casa de apartamentos en la cual se había establecido un taller de costura. Finalmente en *Aponte Betancourt v. Meléndez,* 87 D.P.R. 652 (1963), sostuvimos que el dueño de un negocio de colmado es responsable de los daños causados a una cliente que resbaló dentro del establecimiento sobre una cáscara de guineo. La teoría detrás de la doctrina es que corresponde al dueño del negocio o al propietario el mantener el *"área de invitación"* como un sitio seguro. Véase *Aponte Betancourt, supra,* a la pág. 655.

En todos los casos mencionados se trataba de condiciones peligrosas existentes dentro de los establecimientos correspondientes las cuales eran de conocimiento de los dueños o propietarios o su conocimiento podía imputárseles a éstos. Esas áreas estaban bajo el *"control absoluto de los demandados y naturalmente cargaban con las consecuencias resultantes."*

A diferencia de ese caso, en el nuestro la prueba sostuvo que el área donde asaltaron a Sánchez estaba bajo el control de los dueños de la Farmacia, y éstos fueron los que colocaron el zafacón de los desperdicios indebidamente en el lugar de los hechos. No hay duda que la responsabilidad de los demandados no podía circunscribirse a la parte de adentro de la Farmacia. De todos modos, los dueños de la Farmacia estaban en mejor posición que Sánchez para establecer su diligencia. En lugar de así hacerlo, se cruzaron de brazos trayendo una prueba que no tenía nada que ver con la seguridad de esa área. Así, estos propietarios venían obligados a prevenir los daños que en el ejercicio de su derecho de propiedad se pudiera ocasionar a terceros. *Soc. Gananciales v. González Padín Co., Inc.,* 117 D.P.R. 94 (1986).

Más recientemente, se ha seguido reiterando y aplicando la norma de que en un establecimiento comercial abierto al público, el propietario del mismo tiene el deber particular de mantener esa propiedad en condiciones de seguridad hacia las personas que patrocinan su establecimiento. *Rosado Feliciano v. Supermercado Mr. Special, et al.,* **96 J.T.S. 6;** *Colón García v. Toys "R" Us, Inc.,* **95**

**J.T.S. 153**; *Colón Miranda v. Plaza Las Américas*, **94 J.T.S. 84**; *Rivera Vargas v. Laguna Gardens Shopping Center y Otros*, **96 D.T.A. 145.**

No existe duda de que:

*"Si en Puerto Rico hemos de configurar una obligación de proveer medidas de seguridad y protección razonables, independientes de las del Estado, en las áreas de estacionamiento [4] ha de ser como una extensión lógica y natural del deber aludido **de todo operador de un establecimiento comercial** de mantenerlo en condiciones de seguridad, y no a base del criterio de "naturaleza esencial", el cual, al decir mayoritario, responde sólo al tamaño de los centros comerciales regionales, "...por la variedad de actividades que allí se llevan a cabo y el cúmulo de servicios que se ofrecen, o sea, por su naturaleza esencial...".* (Enfasis nuestro). Opinión Concurrente y Disidente del Juez Negrón García en *J.A.D. Metals v. Centro Plaza Carolina*, **93 J.T.S. 27,** ■ pág. 10442.

Teniendo presente que los operadores de los establecimientos comerciales no aseguran la seguridad de sus patrocinadores y visitantes, *Goose v. Hilton Hotels*, 79 D.P.R. 523, 527 (1956),

*"[l]as medidas de cuidado a desplegarse deben ser sólo razonables, lo cual implica que la obligación ha de concebirse en términos de exigencias mínimas a tono con las realidades y experiencias comerciales específicas. A Landowners Duty to Guard Against Criminal Attack, Foresability and the Prior Similar Incidents Rule, 48 Ohio State L. Journal 246, pág. 270 (1987)." J.A.D. Metals, supra*, pág. 10442.

En el balance de la relación entre las partes y el interés público, luego de evaluar todas las circunstancias relevantes aquí presentes, es forzoso concluir de que ante la ausencia de medidas de seguridad razonables --en el caso *a quo*, ausencia total-- los demandados-apelados son responsables al demandante por sus actos negligentes.

### III

No podemos pasar por alto que en este caso Sánchez no sufrió ningún daño corporal, según él mismo sostuvo desde el día que ocurrió el asalto en cuestión. Sánchez reclamó por haber sufrido daños emocionales y presentó prueba sobre ello, incluyendo peritos médicos y económicos, sobre lo cual el Tribunal de Primera Instancia en su determinación de hecho número 12 concluyó que él sufrió *"[u]n desorden de stress, post traumático controlado y el brote de un desorden bipolar al cual ya estaba genéticamente predispuesto."*

Estamos ante un litigante conocedor de todos los aspectos de litigación en un caso de daños y perjuicios.

Sin entrar a prejuzgar ninguna de las materias relacionadas con los daños ni las determinaciones de hechos de ese Foro judicial o que fueron o pudieran ser objeto de prueba, consideramos que este es el caso apropiado para señalar que los tribunales de justicia no deben impresionarse por lo abultada, irrazonable o desmedida que luzca una reclamación de daños.

Los jueces tenemos la obligación de evaluar los mismos, independientemente a la determinación sobre negligencia a que se llegue en el pleito. En la realidad ocurren casos en que hay negligencia pero no se producen o no se prueban daños. Los jueces de instancia son quienes verdaderamente tienen ante sí los testigos y pueden aclarar todos los aspectos de sus testimonios teniendo, inclusive, la facultad para citar a testigos que las partes no han ofrecido o anunciado. Por ello es que los foros apelativos no intervienen con la valoración de daños efectuada por el Tribunal de Primera Instancia, excepto cuando se trata de cuantías ridículamente bajas o exageradamente altas. *Rosado Feliciano v. Supermercado Mr. Special, et. al*, **96 J.T.S. 6**; *Rodríguez Cancel v. A.E.E.*, 116 D.P.R. 443 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975). Corresponde a todos los tribunales de justicia estar muy atentos a la tendencia que está tomando auge en nuestra sociedad de incrementar y propiciar al máximo el litigio y exagerar los daños con el sólo propósito de abultar las reclamaciones y entender que esa es la manera de obtener indemnizaciones más altas o de lograr mejores transacciones, máxime cuando existe o está como demandada una compañía aseguradora. Ello tiene el efecto de encarecer los costos de la litigación y por consiguiente los gastos de operación de los establecimientos públicos, los

cuales, a su vez, son transferidos al consumidor. Además, tiene el efecto de que ello se utilice como justificación para aumentar las primas de seguros, que son parte de los gastos de operación de los negocios, y que impactan a todos aquellos que tienen pólizas de seguros. Ello redunda en que se afecte la economía del país y todos sus residentes. Para evitarlo los tribunales tienen la obligación de evaluar adecuadamente los daños y sancionar en los casos meritorios la utilización de esas tácticas ajenas a nuestro ordenamiento jurídico.

## IV

Por lo anteriormente expresado, revocaría la sentencia apelada y devolvería este caso al Tribunal de Primera Instancia, Sala Superior de San Juan, para que evaluara, incluyendo --de ser necesaria-- la celebración de una vista evidenciaria sobre los daños, de manera que se haga la adjudicación más justa y razonable para las partes.

**RAMON NEGRON SOTO**
**Juez de Apelaciones**

### ESCOLIOS VOTO DISIDENTE DEL JUEZ DE
### APELACIONES SR. NEGRON SOTO — 97 DTA 183

**1.** De las fotografías surge que ese zafacón medía alrededor de seis pies de largo, seis pies de ancho y seis pies de alto.

**2.** De hecho, ese zafacón a veces obstaculizaba la acera, lo que está prohibido por el Artículo 2.2 de la Ordenanza Municipal Núm. 10, Serie 1984-85, revisada en junio de 1993, del Municipio de San Juan. Tomamos conocimiento judicial de que esta ordenanza es violada impunemente por la mayoría de los dueños de propiedades con uso comercial ubicadas en las principales avenidas y calles donde se han establecido comercios, para estacionar vehículos de motor en forma vertical a la vía pública, sin adquirir conciencia de su responsabilidad en caso de que ello ocasione daños a algún ser humano que tenga que transitar por la calle por razón de la acera estar obstaculizada. Ello denota, cuando menos, una falta de sensibilidad para el prójimo y especialmente hacia los incapacitados y los envejecientes, los cuales van en aumento en nuestra patria. Es tiempo de que todos los integrantes de la sociedad puertorriqueña tomemos todas las medidas, aun con el mayor sacrificio personal, para atender la necesidad apremiante de una mejor calidad de vida.

**3.** De hecho, ante las nuevas corrientes de derecho sería difícil al presente exonerar de responsabilidad a un arrendatario que tiene un negocio de renta de varias propiedades y mantiene por más de una semana una escalera sin alumbrado, no obstante estarle los arrendatarios solicitando su arreglo y haberle advertido que allí pueden ocurrir actos criminales facilitados por esa situación. Véase: *Restatement (Second) of Torts;* Secs. 310-402, (1993); *Seibert v. Vic Regnier Builders Inc.,* 253 Kan. 540, 856 P. 2d 1332 (1993); *Mejías-Quirós v. Maxxan Property Corp.,* 1997 WL 104057 (1st Cir. (Puerto Rico) (1997); *Rendrik v. Allright Parking,* 846 S.W. 2d 453 (1993); *MacQuarrie v. Howard Johnson Company,* 877 F.2d 126 (1989).

**4.** En su nota al calce 1 se dice que:

*"El estacionamiento, sus aceras y áreas aledañas presentan un riesgo especial por las oportunidades que ofrecen para el crimen, ya que los clientes usualmente llevan consigo dinero o mercancía recién adquirida."* Comments: *Business Invitees Duty to Protect Invitees from Criminal Acts,* 134 U.Pa. L. Rev., pág. 886 (1986).

**5.** Véase: Adames Soto, *J.A.D. Metals v. Centro Plaza Carolina,* Vol. 28 Núm. 3, Revista Jurídica de la Universidad Interamericana de Puerto Rico, 431-440 (1994), sobre el criterio utilizado --tamaño-- para fijar responsabilidad en centros comerciales y negocios.