# 2006 DTA 37

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**REGIÓN JUDICIAL DE CAROLINA/HUMACAO/AIBONITO**
**PANEL XII**

RUG ULTRA CLEAN
Demandante-Apelante

v.

PABLO ALTIERI Y OTROS
Demandados-Apelados

Núm. KLAN-2005-00577

San Juan, Puerto Rico, a 23 de enero de 2006

Panel integrado por su Presidenta, la Juez Cotto Vives,
y los Jueces Aponte Jiménez y Morales Rodríguez

Morales Rodríguez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

El dueño de una casa afectada por un incendio contrata a un suplidor de servicios de limpieza y, luego de éste haber terminado su obra, se decepciona por el trabajo y el precio. Con firmeza plantea su problema al suplidor. Como personas civilizadas llegan a una transacción por una cantidad menor a ser pagada en fecha cierta, expresando satisfacción por la obra. Cuando abren el furgón que guarda unos muebles limpiados encuentran una mesita con polvo. El dueño de la propiedad unilateralmente decide pagar la mitad de lo pactado. El juzgador de los hechos, a pesar de la transacción extrajudicial, le da la razón. Desde el punto de vista sustantivo se plantea aquí la importancia del contrato de transacción como fórmula de encuentro humano. Desde el punto de vista procesal, se plantea la sustancial diferencia entre dos evaluaciones en la adjudicación: la de la prueba oral -que sirve para dirimir credibilidad-, y la evaluación de la prueba documental a la luz de las hipótesis fácticas del derecho -en la que los jueces de apelación tenemos más latitud al momento de formar criterio.

Si hemos de contribuir a superar la sociedad litigiosa en que se ha convertido la nuestra -con su grave impacto en los calendarios judiciales y en el gasto material y moral, público y privado-, esa transacción extrajudicial que es resultado del encuentro humano, no puede ser tratada con ligereza. El riesgo de hacerlo sería el desalentar la solución negociada de los conflictos. Aunque, como veremos, la transacción extrajudicial requiera escrutinio judicial para su implantación, el trato que damos a ella debe buscar su más eficaz realización dentro de sus términos fijados por la voluntad transaccional. Los jueces debemos entrar al recinto sagrado del acuerdo descalzándonos el alma como ante la zarza ardiente.

La controversia sometida a nuestra consideración surge de una reclamación en cobro de dinero. Se trata de los trabajos de limpieza y restauración realizados por la parte demandante-apelante, Rug Ultra Clean (en adelante Rug Ultra), en el hogar del doctor Pablo I. Altieri (en lo sucesivo el doctor Altieri). Como resultado de un fuego que afectó su propiedad y los objetos que en ésta se encontraban, el doctor Altieri requirió los servicios de Rug Ultra. Pero insatisfecho con el precio pactado para el servicio, se reunió con el suplidor y éste transigió por una cantidad menor.

En el presente recurso se solicita de este tribunal que demos validez al contrato de transacción suscrito entre las partes el día 10 de diciembre de 1998 en toda su extensión: incluyendo el precio convenido de $40,000 y también los términos adicionales que aparecen en el documento debajo de la firma de los comparecientes. ■ Además, el apelante pide que se reconozca la existencia de una deuda adicional por la limpieza de nueve alfombras, que alega no forma parte del precio convenido en el contrato de servicios original, ni en el precio en

el contrato de transacción. Así también, se cuestiona la validez de la determinación del Tribunal de Primera Instancia sobre: (1)los daños sufridos por el apelado, (2) la imposición de honorarios por temeridad, y (3) la suficiencia del pago realizado por el doctor Altieri a Rug Ultra, por la cantidad de $20,000, como pago total por los servicios ofrecidos. Además, el apelante Rug Ultra solicita que se reconozca un primer pago por la cantidad de $7,500 por los servicios ofrecidos al doctor Altieri; que se admita que dicho pago fue acreditado al precio total convenido originalmente de $50,815.97 y que junto a otros descuentos adicionales resultó en la cantidad convenida en el contrato novado ($40,000).

La relación contractual entre Rug Ultra y el doctor Altieri comienza a consecuencia de un fuego que afectó la propiedad de éste. Rug Ultra es una corporación que se dedica a la limpieza y restauración de propiedades que han sufrido daños por distintas razones, entre ellas, por razón de fuego. Un ajustador de nombre Michael Johnson la llamó para que rindiera servicios de limpieza y restauración en la residencia del doctor Altieri. Ultra Clean, que es una división de Rug Ultra, sometió un estimado mediante documento firmado por Héctor L. Vázquez -consultor y contratista independiente encargado de manejar los proyectos de limpieza y restauración. En el estimado se establecía el precio de $50,815.97 por los servicios que ofrecería Rug Ultra al doctor Altieri. ■ Los trabajos del demandante consistieron fundamentalmente en la limpieza y restauración de la casa y los muebles. Los muebles fueron guardados en un vagón climatizado para ser devueltos a su lugar una vez culminada su restauración. En adición a ese trabajo cotizado según un inventario, proveyeron servicios de limpieza para nueve alfombras del apelado. ■

Posteriormente, el 10 de diciembre de 1998, fecha en la cual ya habían finalizado los trabajos de Rug Ultra en la residencia del doctor Altieri, Vázquez se reunió con Michael Johnson y el doctor Altieri. Renegoció el pago por los servicios de Rug Ultra. Hizo un ajuste aproximado de $10,000 al precio de $50,815.97 convenido originalmente. Se estableció que Rug Ultra debía recibir el pago de la cantidad convenida el día 17 de diciembre de 1998. Rug Ultra alega que la razón de dicho ajuste fue un crédito de $7,500 que hiciera éste a la cantidad original de $50,815.97, el cual correspondía a un primer pago que ya se había efectuado por los servicios ofrecidos al doctor Altieri, ■ y además a un descuento aproximado de $3,500.

Un tiempo después de la reunión del 10 de diciembre de 1998 -la fecha específica de este suceso no se refleja en autos-, el Sr. Vázquez y otros empleados de Rug Ultra se presentaron a la residencia del apelado para entregar los objetos que se encontraban dentro del furgón climatizado. Abrieron el furgón y comenzaron a inspeccionar los objetos allí contenidos. Entonces descubrieron que una mesita negra de televisión tenía rastros de hollín. El doctor Altieri se enfureció y no permitió que el Sr. Vázquez procediera a limpiar la mesita, ni le permitió inspeccionar el restante de los objetos. Posteriormente, le envió una carta, con fecha de 7 de enero de 1999, en la que le indicó que le acompañaba un cheque por la cantidad de $20,000 y que el resto lo pagaría cuando se corrigieran los defectos encontrados en los objetos. Además, indicó en la carta que le interesaba vaciar el furgón lo antes posible y que el Sr. Vázquez le había informado que el uso de éste sería gratuito.

Desde entonces hubo varias llamadas que realizara el Sr. Vázquez al doctor Altieri solicitando la entrega del furgón y el pago de los restantes $20,000. También la Sra. Vanessa Vázquez, gerente general de Rug Ultra, llamó al doctor Altieri solicitando el pago de los $20,000. Se iniciaron gestiones de cobro por el abogado de Rug Ultra para el mes de abril de 2000. Hubo negociaciones infructuosas entre los abogados de las partes para resolver la controversia sin tener que acudir al tribunal.

Finalmente se presentó una demanda en cobro de dinero ante el Tribunal de Primera Instancia de Humacao contra el doctor Pablo Altieri, su esposa, y la sociedad legal de bienes gananciales compuesta por ambos. La demanda suscitó una serie de reclamaciones y contra reclamaciones incluyendo una anterior comparecencia ante este Tribunal de Apelaciones. ■ El Tribunal de Primera Instancia decidió mediante sentencia: (1) que la suma de $20,000 es suficiente compensación por la labor rendida por Rug Ultra; (2) que no correspondía el pago de $6,200 por la limpieza de las alfombras, ya que este costo formaba parte del precio total por los

servicios; (3) que el precio de $40,000 pactado por las partes el 10 de diciembre de 1998, no correspondía a un crédito de $7,500 y un descuento de $3,515.97 que hiciera el demandante al precio original de $50,815.97; (4) que los términos adicionales del contrato novado fueron incorporados unilateralmente por el Sr. Vázquez y por tanto no tienen validez; (5) que Rug Ultra debía pagar la suma de $5,000 por los daños sufridos por el doctor Altieri y su esposa; (6) que el demandante fue temerario y por lo tanto debe pagar la suma de $2,500 como honorarios por temeridad.

La controversia medular en este caso gira en torno al contrato de transacción suscrito entre las partes. Sin embargo, se presentan en este recurso varios asuntos colaterales que ameritan una solución. ▇ Hemos evaluado los señalamientos de error presentados por el apelante y decidimos considerarlos en dos partes: (1) Sobre la transacción y el cumplimiento parcial o defectuoso, y (2) Sobre otros asuntos colaterales.

## 1. Sobre la transacción y el cumplimiento parcial o defectuoso

Rug Ultra y el doctor Altieri acordaron el pago de un precio determinado por servicios especificados de limpieza y restauración. El precio fue $50,815.97; los servicios consistirían en limpiar los objetos dañados por el fuego en la casa del doctor Altieri, que aparecían enumerados en un inventario. Ese fue el contrato entre las partes al cual tenían que atenerse. Pero una vez terminado el trabajo, el doctor Altieri planteó su insatisfacción por los resultados del trabajo proponiendo la rescisión del contrato. Entonces, luego de ponderadas negociaciones, el doctor Altieri acordó suscribir un nuevo acuerdo con Rug Ultra: pagar una cantidad menor, $40,000 a cambio de aceptar que los trabajos realizados eran de su satisfacción.

Aquí saltan a la vista dos figuras del derecho contractual muy definidas. La primera figura es el contrato de transacción, que es un contrato en especie. La segunda figura es uno de los modos de extinguir una obligación, la novación. Las partes pactaron *"un contrato de transacción extrajudicial de carácter novatorio"*, según la llamó el Tribunal Supremo en *Neca Mortg. Corp. v. A&W Dev. S.E.* 137 D.P.R. 860, 876 (1995), el cual extinguió el contrato de servicios original. Veamos cada figura separadamente:

*"La transacción es un contrato por el cual las partes, dando, prometiendo o reteniendo, cada una alguna cosa, evitan la provocación de un pleito o ponen fin al que había comenzado. Art. 1709 del Código Civil, 31 L. P.R.A. sec. 4821."*

De esta definición, surge que son necesarios dos requisitos para que un contrato sea calificado como uno de transacción: (1) que exista una situación de conflicto entre dos o más personas capaz de llegar a los tribunales, y (2) las recíprocas concesiones entre ellas para evitarlo. El contrato de transacción puede ser judicial o extrajudicial, siendo extrajudicial si, *"antes de comenzar un pleito, las partes acuerdan eliminar la controversia mediante un acuerdo"*. *Neca, supra*, pág. 870.

En el caso ante nuestra consideración, como hemos establecido, había entre las partes un contrato de servicios profesionales suscrito el día 11 de noviembre de 1998. Pero, a instancias del doctor Altieri, el Sr. Vázquez, en representación de Rug Ultra, se reunió con el Sr. Michael Johnson y el Sr. Csigay en el Restaurante Chilis de Humacao. Allí discutieron la insatisfacción que había con los trabajos realizados. La reunión culminó en la residencia del doctor Altieri. Acordaron la modificación del precio del contrato, de $50,815.97 a $40,000. El doctor Altieri testificó reiteradamente que era su intención rescindir el contrato; que el propósito de dichas reuniones era precisamente rescindir amigablemente el contrato. El resultado al que se llegó ese día corresponde a las negociaciones entre las partes para no llegar al extremo de un pleito. Se hicieron concesiones recíprocas. El apelante se comprometió a aceptar el pago de $40,000 por sus servicios y el doctor Altieri acordó no litigar la rescisión, expresando su satisfacción con el trabajo hecho. Así se configuró un claro contrato de transacción.

La concesión hecha por Rug Ultra no fue insignificante. Extinguió un contrato 20% más lucrativo. Pero la

concesión del doctor Altieri tampoco fue menor: entregó una expresión incondicional aceptando la obra ya realizada. Conforme dispone el Artículo 1157 del Código Civil, 31 L.P.R.A. sec. 3241, las obligaciones pueden modificarse variando sus condiciones principales. Para que se entienda que ha habido novación, se requiere alguna discrepancia entre la nueva y la antigua obligación, lo que la doctrina conoce como el *aliquid novi*, es decir, un elemento nuevo. *Marina Ind. Inc. v. Brown*, 114 D.P.R. 64, 74 (1983). En el presente caso, el nuevo contrato suscrito, titulado *"Payment Agreement"*, respondió a un elemento nuevo que fue la insatisfacción de una parte con el trabajo realizado por la otra. La solución hallada por las partes a ese elemento nuevo fue la reducción del precio a cambio de la aceptación de la obra.

Corresponde declarar, de entrada, la consecuencia de todo esto. De una parte: *"La transacción tiene para las partes la autoridad de la cosa juzgada"*, Art. 1715 del Código Civil, 31 L.P.R.A. sec. 4827. En principio *"esto significa que las partes tienen que considerar los puntos discutidos como definitivamente resueltos"* - *Neca, supra*, pág. 872-. De la otra: una vez novado el contrato entre las partes -estableciendo que las obligaciones habían sido completadas a satisfacción de su acreedor a cambio de un precio reducido-, el contrato anterior quedó extinguido por ser *"de todo punto"* incompatible con el contrato novado. Art. 1158, 31 L.P.R.A. sec. 3242. Discutiremos esto con algún detalle.

El Código Civil establece que la novación es uno de los modos de extinción de las obligaciones. Art. 1110, 31 L.P.R.A. sec. 3151. Para que una obligación se entienda extinguida es preciso que las partes así lo declaren, o en defecto de tal declaración, que la obligación antigua y la nueva sean de todo punto incompatibles. Art. 1158, 31 L.P.R.A. 3242. Esta es la llamada novación extintiva. Supone la creación de una nueva deuda cuyo efecto principal es sustituir una deuda anterior, que no podrá subsistir por ser incompatible con la nueva. En ausencia de la expresión indubitada de las partes de su intención de novar el contrato, surgirá ésta de la incompatibilidad de las dos obligaciones. Véase *United Surety & Indemnity Co. v. Bayamón Steel Processors Inc.,* resuelto el 13 de abril de 2004, **2004 JTS 65**. La novación extintiva nunca se presume, sino que ha de ser acreditada sin género alguno de duda. *Warner Lambert v. Tribunal Superior*, 101 D.P.R. 378, 389 (1973).

Hemos dicho que, en principio, el efecto del contrato de transacción es la cosa juzgada. Pero una transacción extrajudicial como la del caso ante nuestra consideración no tiene el mismo alcance que una transacción judicial. Mientras la última puede ejecutarse cual si fuera una sentencia, en *Neca,* el Tribunal Supremo aclara, con base en el Código y la doctrina científica, que la transacción extrajudicial *"sólo puede hacerse cumplir cuando se haya declarado su eficacia en el juicio correspondiente"*.

En *Neca,* el Tribunal Supremo discute ampliamente si la facultad resolutoria que le concede el Art. 1077, 31 L.P.R.A sec. 3052, a la parte perjudicada por el incumplimiento de un contrato, es aplicable a una contrato transaccional. Concluye que *"el tribunal al evaluar el contrato, puede conceder el remedio de la resolución, siempre y, cuando se cumpla con los requisitos establecidos en el Art. 1077"*, *Neca, supra,* pág. 875. En realidad, hay un solo requisito en ese Artículo: que las obligaciones del contrato sean recíprocas.

En nuestro caso, el doctor Altieri, después de haber hecho la citada transacción, alegó que Rug Ultra aún no había cumplido satisfactoriamente con su prestación. Por eso decidió pagar sólo $20,000 de los $40,000 a los que se comprometió en ella. El Tribunal de Primera Instancia acogió este argumento. Resolvió que no correspondía pagar el total convenido y que el pago de $20,000 era suficiente. En su alegación responsiva ante este recurso de apelación argumenta el doctor Altieri que bajo *"la excepción de cumplimiento parcial"* no procedía el pago total por los servicios. Cita como autoridad la decisión del Tribunal Supremo en el caso de *Álvarez de Choudens v. Rivera Vázquez*, resuelto el 17 de junio de 2005, **2005 J.T.S. 90**.

La llamada excepción de cumplimiento parcial es una doctrina derivada del citado Art. 1077 sobre el derecho de resolver obligaciones recíprocas. Cuando una parte pretende exigir el cumplimiento de una prestación que se le debe, habiendo cumplido la suya de forma parcial o defectuosa, a esa pretensión se le puede

oponer la citada excepción. Resume así *de Choudens*, la doctrina aludida:

*"El efecto o consecuencia primordial de la aplicación de la excepción es que el demandado no vendrá obligado a cumplir con su parte hasta tanto el demandante cumpla con su prestación totalmente o libre de defectos. [Citas omitidas] Ahora bien, no todo supuesto de cumplimiento parcial o defectuoso puede tener el efecto de liberar al demandado de cumplir con su prestación. El demandado no podrá invocar con éxito la doctrina en los casos en que la aplicación de la exceptio non rite adimpleti contractus puede resultar contraria al principio de buena fe en la contratación. [Citas omitidas] Así, por ejemplo, si la causa del incumplimiento parcial o defectuoso se debe a la conducta del demandado, resulta obvio que no se puede invocar la excepción. Tampoco se podrá invocar, con éxito, la excepción si el demandado admitió la contraprestación sin reserva ni protesta alguna cuando pudo comprobar los defectos, ya que iría contra sus propios actos. [Citas omitidas] En estos casos es que el tribunal deberá reconocer una disminución proporcional del precio, en razón de lo no cumplido o de los defectos en la prestación."*

En *de Choudens*, el Tribunal Supremo examinó el contrato entre las partes y concluyó que, como cuestión de derecho, había un contrato recíproco; también concluyó, como cuestión de hecho, que había una contraprestación cumplida parcial o defectuosamente. Aquí se alega, como cuestión de hecho, que la mesita con rastros de hollín, de entre un número considerable de artículos que fueron trabajados por Rug Ultra, justifique bajar el precio $20,000 más de los $10,000 ya transigidos; que esa mesita sea prueba de un incumplimiento tan parcial o defectuoso. Pero hay una cuestión de derecho: En el caso ante nuestra consideración, el contrato de *"transacción extrajudicial de carácter novatorio"* vigente entre las partes no era ya un contrato recíproco. Encontramos que la excepción hubiese sido defensa contra el contrato extinguido -que era recíproco-, pero no en cuanto al contrato de novación transaccional que lee como sigue:

*"PAYMENT AGREEMENT:*

*This agreement between Rug Ultra Clean, Inc. and Pablo Altieri. Both parties agree that the work performed at Dr. Altieri´s home, in relation to the contents cleaning has been completed as stated in Rug Ultra clean estimate #98-117 to Dr. Altieri satisfaction.*

*Both parties also agree that the total amount for the cleaning described in the estimate is $40,000 (Fourty thousand dollars).*

*Payment for this total amount is expected by December 17, 1998.*

*Signed today December 10, 1998 in Humacao, PR"*

Aparece firmado por Pablo Altieri, Héctor L. Vázquez y Mike (sic) Johnson.

El doctor Altieri, al suscribir ese contrato, después de haberlo inteligentemente negociado, no puede evadir su única obligación. El *"Payment Agreement"* dice: (1) que es un acuerdo de pago, (2) que los trabajos hechos por Rug Ultra estaban *"completos"* y que fueron hechos a satisfacción del doctor Altieri, y (3) que éste pagaría $40,000 el 17 de diciembre de 1998. El doctor Altieri aceptó el trabajo a cambio de una rebaja y se obligó a pagarlo; no había otra contraprestación pendiente. No podemos darle otra interpretación a ese texto. Tenemos que decir aquí lo mismo que dijo el Tribunal Supremo en *de Choudens*:

*"[C]onstituye jurisprudencia reiterada que, en lo que respecta a la evaluación de prueba documental, este Tribunal está en idéntica situación que los tribunales de instancia [citas omitidas]; razón por la cual en el presente caso estamos en la misma posición que el foro de instancia para evaluar la "carta-contrato" (...)".*

Si el contrato de transacción hubiese sido recíproco, hubiese sido posible que el doctor Altieri presentara una acción resolutoria o una de *quanti minoris*, como en *Neca* o *de Choudens*. Aún así, en ese caso, el doctor Altieri, como deudor renuente, hubiese tenido que enfrentarse a una hipótesis fáctica citada en *de Choudens*: "*Tampoco se podrá invocar, con éxito, la excepción si el demandado admitió la contraprestación sin reserva ni protesta alguna cuando pudo comprobar los defectos, ya que iría contra sus propios actos.*" Y otra cosa: En el récord ante nuestra consideración se hace imposible determinar que en efecto Rug Ultra hubiese dejado de limpiar diligentemente otras pertenencias del doctor Altieri que no fuera la mesita. Él no permitió a Rug Ultra la evaluación del restante de los objetos. No hay prueba alguna en el récord de otros objetos con polvo de hollín. Aquí también, Altieri hubiese tenido que enfrentarse a una hipótesis fáctica citada en *de Choudens*: "*si la causa del incumplimiento parcial o defectuoso se debe a la conducta del demandado, resulta obvio que no se puede invocar la excepción.*"

Pero está claro que el contrato que aquí hemos transcrito y leído no contiene una obligación recíproca. Es un acuerdo de pago que el doctor Altieri -por su propia responsabilidad, sin ser coaccionado y sin estar en condición de indefensión alguna-, suscribió. Aquí no faltaba nada por hacer de parte de Rug Ultra, que no fuera bajar las cosas del furgón en manos del doctor Altieri, cuando éste se lo permitiera, y llevárselo. El doctor Altieri tenía que pagar los $40,000 el 17 de diciembre de 1998 sin más condición porque ya había aceptado el trabajo como uno completo. *Pacta sunt servanda.*

## 2. Sobre otros asuntos colaterales.

### Primer asunto

El apelante Rug Ultra alega que erró el Tribunal de Primera Instancia al concluir que unos términos adicionales contenidos en el acuerdo transaccional debajo de la firma de las partes, no eran parte del acuerdo. El acuerdo se suscribió en tres originales: uno lo retuvo Rug Ultra, que es el que tenemos en autos, otro lo retuvo el doctor Altieri y el tercero lo retuvo el ajustador Johnson. Sólo el primero fue presentado al tribunal. El doctor Altieri alegó que las condiciones que aparecen bajo las firmas no estaban allí cuando él suscribió el contrato.

Argumenta Rug Ultra que según las presunciones establecidas, las Reglas de Evidencia se debe concluir que el apelado no presentó su copia del contrato en cuestión porque ésta le era adversa. Se ampara específicamente el apelante en la Regla 16(5) y 16(6) de las de Evidencia, 32 L.P.R.A. Ap. IV, R. 16(5) y (6), que dispone lo siguiente: "*Que toda evidencia voluntariamente suprimida resultará adversa si se ofreciere*" y "*Que toda evidencia superior habrá de ser adversa a la presentación de otra inferior*".

La primera de estas presunciones es la que opera cuando una parte anuncia a un testigo u otro tipo de prueba, como por ejemplo, una evidencia documental, y no la usa. Para poder escapar de esta presunción, la parte contra la cual opera tiene que poner a disposición de la otra parte, el testigo o la otra prueba que ha dejado de usar. Véase E.L. Chiesa, *Tratado de Derecho Probatorio*, San Juan, **Pulicaciones J.T.S.**, Tomo II, pág. 1110; *Granados v. Rodríguez*, 127 D.P.R. 1, 28 (1990); *Rivera Aguila v. K-Mart*, 123 D.P.R. 599, 613 (1989). La segunda de las mencionadas presunciones es de aplicación en aquellas instancias en que una parte presenta evidencia secundaria cuando hay evidencia primaria disponible. Cuando se presenta evidencia secundaria para probar un hecho, la existencia de evidencia primaria será indicativa de que ésta es adversa al proponente de la inferior o secundaria.

Se trata sólo de indicios de valor probatorio. Las citadas presunciones no excluyen que el proponente prevalezca ante el juzgador aun cuando se haya limitado a presentar evidencia testifical o secundaria. Véase E. L. Chiesa, *op. cit.*, pág. 919. En el presente caso, aun cuando el doctor Altieri se limitó a presentar su testimonio -para establecer que nunca aceptó las condiciones adicionales que alega el apelante eran parte del contrato-, al juzgador de hechos le mereció entero crédito. Reitera el Tribunal Supremo en *de Choudens* lo que

es doctrina trillada en nuestro derecho procesal:

> *"Sabido es que un tribunal apelativo no deberá, de ordinario, intervenir con las determinaciones de hechos ni con la adjudicación de credibilidad que ha realizado el juzgador de los hechos, salvo que haya mediado pasión, prejuicio, parcialidad o error manifiesto [citas omitidas]. En el presente caso no existe ninguna de estas situaciones, por lo que no hay razón alguna para intervenir con la apreciación de la prueba oral que hiciera el foro de instancia."*

Tampoco nosotros vemos aquí razón por la cual debemos intervenir con las determinaciones del tribunal en este aspecto. No encontramos en autos ninguna razón para adjudicar que el tribunal sentenciador haya actuado movido por pasión, prejuicio o parcialidad o que haya cometido error manifiesto al determinar que el apelado no aceptó dichos términos. Tanto el apelante como el apelado anunciaron como testigo al Sr. Michael Johnson, y ninguno de ellos utilizó su testimonio. El Sr. Michael Johnson era esencial para demostrar si efectivamente los términos eran parte del contrato o si nunca habían sido aceptados por el doctor Altieri. Ninguna de las partes usó su testimonio, teniendo la oportunidad de hacerlo. No podemos concluir que el testimonio del Sr. Johnson hubiese sido perjudicial para el doctor Altieri, pues Rug Ultra lo pudo haber presentado para corroborar que en efecto los términos eran parte del contrato. La presunción opera también en su contra.

Aún así, Rug Ultra plantea con razón que el tribunal *a quo* erró al determinar que el Sr. Vázquez hubiese admitido en su testimonio haber incorporado los términos adicionales de forma unilateral. Surge de la transcripción de la prueba que el testimonio del Sr. Vázquez a estos efectos fue el siguiente:

*"LCDA. LIND:...En relación a ese acuerdo o negociación, explíquenos cuáles fueron los términos de esa negociación que usted habló hace unos minutos con fecha del 10 de diciembre del noventa y ocho.*

*TESTIGO: Luego de que se estableció la cantidad final de cuarenta mil dólares, el doctor me indica que qué vamos a hacer con ese contenido, que él todavía no ha terminado la...*

*...*

*TESTIGO: Me pidió el doctor que qué íbamos a hacer con el contenido, que necesitaba tiempo adicional y eran una serie de peticiones adicionales que yo dije, pues, espérate, déjame darle por lo menos sesenta días o el máximo, hasta de sesenta días. Y entonces, pues, preparé esos términos para garantizar de que luego de que pasaran esos sesenta días, se me pagara en base de mil quinientos dólares mensuales por el uso adicional.*

*...*

*LCDA. LIND: Le pregunto, ese documento ¿qué se hizo con él si algo?*

*TESTIGO: Pues, se preparó y cuando, verdad, se acordó el precio, cuando el doctor pues, me dice, "pero mire, qué vamos a hacer con esta mercancía, necesito tiempo adicional" y qué se yo. Pues, entonces, yo cogí el documento sin ... o sea, lo que se había era leído y entonces, lo pasé nuevamente para escribirle los términos.*

*...*

*LCDA. LIND: Y ese documento, ¿fue firmado?*

*TESTIGO: Sí, una vez determinado que se leyó y estaba todo el mundo de acuerdo, se firmó."*

El Sr. Vázquez no aceptó en su testimonio haber incluido los términos unilateralmente y sin el

consentimiento del demandado. El Sr. Vázquez se limitó a establecer que había redactado el documento en su ordenador portátil, en la residencia del doctor Altieri y en presencia de éste. En ningún momento manifestó que había añadido cláusulas luego de haberse firmado el contrato. Testificó que luego de haberse leído el contrato, el doctor Altieri le solicitó unas peticiones adicionales y que en ese momento fue que procedió a preparar los términos adicionales; que una vez redactado finalmente el acuerdo, se leyó y se firmó. Por lo tanto, el tribunal erró en esa determinación en particular.

Ahora bien, esa conclusión nuestra no nos lleva a intervenir con la credibilidad que le haya merecido el testimonio del Sr. Vázquez al tribunal sentenciador. Le damos entero crédito a la credibilidad que le confirió al testimonio del doctor Altieri sobre los términos adicionales. Las Reglas de Evidencia establecen que: *"La evidencia directa de un testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que por ley otra cosa se disponga"*, Regla 10 de las de Evidencia, 32 L.P.R.A. Ap. IV.

Resulta increíble que una persona que logra una disminución sustancial del precio por un servicio recibido, por causa de sus defectos, esté dispuesto a aceptar términos adicionales tan onerosos por el alquiler de un vagón cuando tal alquiler no había sido pactado antes. Es cuestionable también que una persona que ha pactado recibir un canon de arrendamiento de $1,500 mensuales no haga ningún tipo de gestión para cobrar la mensualidad. En el presente caso, no existe evidencia alguna de que Rug Ultra hubiese solicitado el pago de los $1,500 mensuales por el uso del vagón. No existen facturas ni cartas u otro tipo de evidencia que demuestre gestiones para solicitar ese pago. El testimonio del Sr. Vázquez se limita a establecer que en varias ocasiones había llamado al doctor Altieri para solicitar la devolución del vagón climatizado y el pago de los restantes $20,000 convenidos en el contrato. ¿Cómo es entonces que el demandante, quien ha convenido recibir un pago de $1,500 mensuales, no haga nada y se limite únicamente a pedir la devolución del vagón? Más aún, ¿cómo es posible que ante una carta enviada por el doctor Altieri, en que arguye que el uso del vagón fuera libre de costo, el apelante no conteste, corrigiendo la afirmación errónea si es que en realidad tenía derecho al pago de un canon de $1,500 mensuales? El tribunal sentenciador estaba en mejores condiciones para dirimir todas estas inconsistencias. Tiene la ventaja de observar a los testigos y por lo tanto esta en mejor posición de adjudicar su credibilidad.

Rug Ultra opone a esa conclusión la regla de la mejor evidencia, que en su caso es el único original del *"Payment Agreement"* que obra en autos. La regla de la mejor evidencia se encuentra contenida en la Regla 69 (A) de las de Evidencia, 32 L.P.R.A. Ap. IV, y lee como sigue: *"A menos que un estatuto o estas reglas dispongan otra cosa, para probar el contenido de un escrito, grabación o fotografía, se requiere la presentación del escrito, fotografía o grabación original"*. La razón de ser de la citada regla es que para probar el contenido de un escrito es necesario presentar el escrito mismo. Pero esta regla, aunque privilegia la mejor evidencia, no la exige como único medio para probar un hecho; no limita el uso de evidencia secundaria en oposición de la primaria. Véase E.L. Chiesa, *op. cit.*, pág. 919. Sobre esto se ha expresado nuestro más alto foro judicial para establecer que aun cuando la mejor prueba de la existencia y el contenido de un contrato es el documento mismo, eso no significa que ésta es la única prueba. Véase *Colondres Vélez v. Bayrón Vélez,* 114 D. P.R. 833, 837 (1983). En ese caso, el Tribunal Supremo entendió que el uso de prueba secundaria, como lo es la prueba testifical, es suficiente para probar la existencia y contenido de un contrato.

Está claro que la mejor evidencia para probar el contenido del *"Payment Agreement"* es el documento mismo. Sin embargo, esa no es la única prueba; visto el citado documento junto a la prueba testifical, no hallamos razón para despreciar la determinación del hecho: los términos adicionales fueron añadidos. Es una cuestión de credibilidad resuelta por quien vio a los testigos al momento de juzgar.

*Segundo asunto*

Se suscita otra controversia en el presente caso sobre la inclusión de nueve alfombras dentro de lo que el

juzgador de los hechos consideró como el precio por los servicios ofrecidos al doctor Altieri. Rug Ultra alega que la limpieza de dichas alfombras constituia un contrato aparte que no estaba incluido en el contrato original por $50,815.97, ni dentro del contrato novado por $40,000. Por su parte, el doctor Altieri alega que el precio por la limpieza de las nueve alfombras sí era parte tanto del precio convenido por los servicios de Rug Ultra, como del precio pactado en el contrato novado.

Hemos citado que en relación con la prueba documental, los tribunales apelativos están en las mismas condiciones que el tribunal de instancia. Una evaluación de la prueba documental aquí sometida nos lleva a concluir que en efecto, la limpieza de las nueve alfombras no era parte del costo total original convenido por las partes; tampoco estaba incluida en el precio pactado en el contrato transaccional.

Existe en autos una factura titulada *"Invoice 98-118"* de fecha 23 de noviembre de 1998, la cual hace referencia a la limpieza de alfombras por una cantidad de $2,700. En dicha factura también se hace referencia a la limpieza de otros objetos -los cuales no fueron identificados- por la cantidad de $3,500. El inventario -titulado *"JOB 98-117"*- preparado por Rug Ultra en relación con los servicios ofrecidos en la residencia del doctor Altieri, no incluye la limpieza de las alfombras en cuestión. Forzoso es concluir que el precio por la limpieza de las alfombras no era parte del contrato original entre las partes. Tampoco era parte del contrato transaccional con carácter novatorio. Allí se hace referencia al estimado *"#98-117"*. Esto prueba que la transacción estaba limitada únicamente a los servicios de limpieza pactados el día 11 de noviembre de 1998, y no a la limpieza de las alfombras pactada después. *"La transacción no comprende sino los objetos expresados determinadamente en ella, o que por una inducción necesaria de sus palabras, deban reputarse comprendidos en la misma."* Art. 1714, 31 L.P.R.A. sec. 4826. Véase también *Negrón Rivera y Bonilla, Ex Parte*, 120 D.P.R. 61, 74.

Pero el costo correspondiente a la limpieza de las alfombras en cuestión asciende a la cantidad de $2,700 y no a la de $6,200 que pretende Rug Ultra por este servicio. La factura que tenemos ante nuestra vista establece que el precio por la limpieza de las alfombras era de $2,700. Los restantes $3,500 correspondían a la limpieza de otros objetos sobre los que no hay prueba en récord.

*Tercer Asunto*

En un raro argumento, Rug Ultra señala como error que el tribunal no reconociera un primer pago de $7,500, correspondiente a los trabajos de Rug Ultra, como abono al primer contrato. El Tribunal de Primera Instancia concluyó que Rug Ultra no presentó prueba de un crédito a la cantidad original de $50,815.97 para justificar el descuento en el contrato novado por la cantidad de $40,000. Según el testimonio del señor Vázquez, el doctor Altieri hubiese trasmitido un cheque de $7,500 a través del señor Csigay -quien estaba efectuando la remodelación de la casa-, como abono al pago del primer contrato. Testificó que cuando él concedió una rebaja del precio, acreditaba los $7,500 de ese cheque. Ese cheque no pudo ser cobrado. Aunque no hubo una alegación sobre esto en la demanda, es como si Rug Ultra quisiera recobrar los $7,500 ahora.

El testimonio del Sr. Vázquez al respecto es obviamente contradictorio y torpe. No le mereció credibilidad alguna al juzgador de los hechos. Concurrimos: la transacción no incluyó un crédito de $7,500 que se le hubiese pagada a Rug Ultra. El examen de la prueba testifical -específicamente el testimonio del doctor Altieri- junto con la documental -específicamente el *"payment agreement"*-, demuestra que el descuento de $10,000 fue eso, un descuento en reconocimiento a la insatisfacción manifestada por el cliente con el trabajo y el precio de Rug Ultra.

*Cuarto asunto*

El tribunal sentenciador hizo una determinación donde calculó en $5,000 los daños y perjuicios que

alegadamente le ocasionó al doctor Altieri y su esposa la tardanza en los servicios y la baja calidad del trabajo. Esto lo hizo sin prueba en apoyo de su conclusión.

En récord aparece solamente el testimonio del doctor Altieri indicando que tuvo que contratar a otras personas para terminar la limpieza y que estaba insatisfecho con el trabajo. En ningún momento presentó contrato, ni facturas, ni pagos realizados; tampoco especificó las distintas partidas correspondientes a los daños especiales o patrimoniales que sufriera, si alguno. La única prueba de daños en este caso es una mesa con polvo de hollín de entre una cantidad considerable de objetos. Esa no es prueba suficiente para determinar que el doctor Altieri sufrió daños materiales o morales.

Surge del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, y de trillados principios relacionados con la responsabilidad civil extracontractual, que para probar una causa de acción por daños y perjuicios es esencial que concurran tres requisitos: (1) la realidad del daño sufrido; (2) nexo causal entre el daño y la acción u omisión del demandado, y (3) que la acción u omisión sea culposa o negligente. *Santini Rivera v. Serv. Air., Inc.,* 137 D.P.R. 1, 6 (1994); *Soc. Gananciales v. González Padín Co., Inc.,* 117 D.P.R. 94, 106; *Pérez Escolar v. Collado,* 90 D.P.R. 806, 811 (1964); *Hernández v. Fournier,* 80 D.P.R. 93, 96-97 (1957). Nuestra más alta magistratura ha establecido que el propósito de una acción por daños y perjuicios es resarcir al damnificado, otorgándole un valor económico o pecuniario a los daños sufridos, de forma que se cree una situación patrimonial equivalente a la destruida por el daño causado. Véase *Rivera v. Tiendas Pitusa, Inc.,* 148 D.P.R. 695, 700 (1999). Sin embargo, también ha dejado claramente establecido que *"al valuar y mensurar los daños, el juzgador debe hacerlo en estricta correlación con la prueba presentada, procurando mantener un sentido remediador sin aproximarse al elemento punitivo".* Rivera v. Díaz, **2005 J.T.S. 121**; *Rivera v. Tiendas Pitusa, Inc., supra; Vda. de Valentín v. E.L.A.,* 84 D.P.R. 112, 123 (1961).

Corresponde al reclamante probar cada uno de los mencionados requisitos por preponderancia de la prueba. Según establecen nuestras Reglas de Evidencia: *"La obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia".* Regla 10(B), 32 L.P.R.A. Ap. IV. La Regla 7.4 de Procedimiento Civil dispone además que cuando se reclamen daños especiales, se detalle el concepto de las distintas partidas. 32 L.P.R.A. Ap. III. Es necesario que el reclamante le provea al tribunal los datos necesarios para que éste pueda cuantificar el daño que se reclama y dar la indemnización correspondiente. *Rivera v. Díaz, supra.*

Por otra parte, para probar daños morales, la parte reclamante debe presentar prueba que demuestre que realmente se ha visto afectado su bienestar, salud y felicidad. Asimismo, nuestro más alto foro judicial ha dejado consignado que no basta que se demuestre una pena pasajera, sino que es imprescindible que el reclamante demuestre que ha quedado verdaderamente afectado al tener que sobrellevar sufrimiento y angustias morales profundas. *Rivera v. Díaz, supra; Hernández v. Fournier, supra.*

El doctor Altieri no presentó la prueba documental o testifical para que el tribunal pudiese determinar que en efecto había sufrido daños y la cuantía de éstos. Tampoco demostró haber sufrido daños morales como consecuencia del mal rato por lo de la mesita. No existe en autos prueba alguna que demuestre que el bienestar, salud y felicidad del apelado se hayan visto afectados por razón de su insatisfacción con el trabajo del apelante.

*Quinto asunto*

Se impugna finalmente la determinación de honorarios por temeridad. La Regla 44.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 44.1, dispone, en lo pertinente, lo siguiente:

*"En caso que cualquier parte o su abogado haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el*

*tribunal entienda correspondan a tal conducta."*

No surge de autos que en este caso Rug Ultra haya actuado con temeridad, frivolidad, terquedad, obstinación o contumacia. Al contrario, el apelante presentó una causa de acción para vindicar un derecho que le asistía. El doctor Altieri, después de lograr una transacción extrajudicial en la que quedó comprometido a pagar $40,000 en fecha cierta, dejó de pagar la mitad de la cantidad pactada por los servicios que había aceptado como completados a su entera satisfacción.

El Tribunal de Primera Instancia concluyó que Rug Ultra fue temerario al no presentar prueba alguna que rebatiera las determinaciones de hechos y conclusiones de derecho a las que había llegado ese mismo tribunal cuando dictó la sentencia desestimando la causa. Se refería a la desestimación que fuera revocada por este Tribunal de Apelaciones. Su razón medular para desestimar la causa, en aquella ocasión, fue la falta de capacidad representativa del Sr. Vázquez para contratar a nombre de Rug Ultra. La intervención de este tribunal se limitó a determinar que no procedía la desestimación bajo la Regla 39.2(c) de Procedimiento Civil, debido a que existían dudas sobre la falta de méritos de la acción. En los méritos, Rug Ultra logró rebatir esa determinación medular de hecho. El Tribunal de Primera Instancia concluyó en su sentencia de 6 de abril de 2005 que el Sr. Vázquez sí tenia dicha capacidad representativa.

Según hemos determinado, Rug Ultra tenía derecho al pago ajustado en el *"payment agreement";* también tenía derecho al pago de la cantidad de $2,700 por la limpieza de las alfombras.

En términos generales, se entiende temeraria toda aquella conducta que obligue a un pleito que se pudo evitar, que lo prolongue innecesariamente, o requiera a la otra parte efectuar gestiones innecesarias. *Blas v. Hosp. Guadalupe*, 146 D.P.R. 267, 335 (1998); *Torres Ortiz v. E.L.A.,* 136 D.P.R. 556, 565 (1994); *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 299, 329 (1990); *Hawayek v. A.F.F.,* 123 D.P.R. 526, 537 (1989). El propósito de la imposición de honorarios de abogado cuando una parte ha sido temeraria es *"establecer una penalidad a un litigante perdidoso que por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte, innecesariamente, a asumir las molestias, gastos, trabajos e inconveniencias de un pleito". Blas v. Hosp. Guadalupe, supra.* La parte que de buena lid ejerce y defiende sus derechos, no debe ser considerada como un litigante temerario aunque la pierda. *González v. Commonwealth Ins.,* 140 D.P.R. 673, 692 (1996). De lo contrario, se estaría penalizando a quien decide acudir al tribunal para vindicar sus derechos por el mero hecho de no haber prevalecido en su acción.

Por todo lo anterior, revocamos el dictamen del Tribunal de Primera Instancia y ordenamos el pago de los restantes $20,000 pactados en el contrato de transacción extrajudicial con carácter novatorio. Ordenamos, además, el pago de $2,700 por la limpieza de nueve alfombras. Revocamos la determinación de daños que hiciera el tribunal y la imposición de $2,500 como honorarios por temeridad. Por último, confirmamos que, según lo determinó el Tribunal de Primera Instancia, como cuestión de hecho, los *"Terms"* no eran parte del *"Payment Agreement"*, y que el contrato de transacción no acreditó un pago de $7,500 que se hubiese hecho antes a Rug Ultra. Por consiguiente, no corresponde ninguna compensación a Rug Ultra por esos dos últimos conceptos.

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones